Argued and submitted June 30, affirmed October 7, petition for review denied December 23, 2009 (347 Or 446)

In the Matter of J. R. W.,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

S. W.,
*Appellant.*

Multnomah County Circuit Court
2007804041;
Petition Number 105253;
A141009

218 P3d 558

James J. Spindor argued the cause and filed the brief for appellant.

Michael R. Washington, Senior Assistant Attorney General, argued the cause for respondent State ex rel Juvenile Department of Multnomah County. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Kevin James Ellis filed the brief for respondent child, J. R. W.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

Mother appeals from a judgment terminating her parental rights to her older child, J.[1] We review the record *de novo*, ORS 419A.200(6)(b),[2] and affirm.

Mother, who has been diagnosed with a personality disorder, concedes that she was not a fit parent at the time of the termination hearing, which took place about 21 months after J was removed from her care. She contends, however, that the juvenile court erred in ordering termination because the Department of Human Services (DHS)—by failing to provide individual mental health therapy and, more specifically, dialectical behavior therapy (DBT)—failed to make reasonable efforts to enable J's return to her care. She also contends that, because she could complete DBT within a year, J could be returned to her within a reasonable time and that termination is not in J's best interests.[3] For the reasons set forth below, we reject those contentions.

We begin with a recitation of the facts, with a view toward DHS's efforts to enable J's return to mother's care. J was born in March 2006. DHS became involved with the family a year later, after receiving a report that mother was using controlled substances and that there was domestic violence in the home. According to mother's trial testimony, she was using alcohol, as well as Vicodin and other medications that had not been prescribed to her. She and father were engaging in mutual domestic violence—yelling, hitting, kicking, and throwing things. Mother downplayed the effect of this violence on J, commenting that "he just slept through it."

Because DHS continued to receive reports of domestic violence and drug and alcohol use and mother refused to

---

[1] Father relinquished his parental rights. Mother's younger child, A, was born shortly before trial; mother's parental rights to him are not at issue in this proceeding.

[2] The 2009 Legislative Assembly amended the statutes governing the standard of review for termination of parental rights. SB 262, §§ 2, 6 (2009). Because the notice of appeal in this case was filed before the effective date of those amendments, they do not affect our analysis.

[3] Mother also argues that her trial attorney provided inadequate assistance. We have reviewed the entire record and reject that argument without further discussion.

cooperate with an assessment, J was removed from mother and father in mid-March 2007 and placed in foster care. At the time of the removal, he had a black eye, for which mother had no explanation. A few weeks later, J was placed with his paternal grandparents, where he remained at the time of the termination hearing. Mother did not appear at the May hearing at which the juvenile court took jurisdiction. The following month, however, mother and DHS entered into an agreement requiring her to participate in parenting classes, treatment for drug and alcohol abuse, an anger management program, and a psychological evaluation, as well as to obtain safe and suitable housing, maintain regular visitation and regular contact with DHS, comply with the mutual restraining orders between mother and father, and sign releases of information.

Since that time, mother has never failed to engage in a service that DHS has asked of her and has never requested a service that DHS has failed to provide. Mother completed a 15-month anger management program and participated in a parenting program for about six months. She also participated in a program of drug and alcohol treatment before shifting to a group with a focus on safety from domestic violence, which she attended for several months.

Mother apparently derived very limited benefits from those services, however. Her caseworker, Wagner, thought that mother did not understand, despite repeated explanations, that DHS expected to see participation in services result in changes and improved understanding. Wagner worked extensively with mother's attorney's assistant "to figure out what it is that we could do to help [mother], because we couldn't figure out exactly what it was that was really kind of hindering her progress, and unfortunately there wasn't anything else that we could do."

Soon after mother began participating in services, providers reported concerns about her erratic behavior and questioned her ability to benefit from services.[4] The

----

[4] Mother's drug and alcohol counselor, Burgess, was "always concerned about how much she was actually getting out of" treatment because her comments and reactions sometimes seemed disconnected from the subject at hand. During an individual therapy session, when he spoke with mother about "her tendency to be

providers' reports were consistent with Wagner's own observations. At first, Wagner believed that mother's behavior could primarily be attributable to substance abuse, so "we were kind of waiting for some of the behavior to subside, and it didn't. And so we really kind of I think determined that it was primarily related to mental health."[5]

In October, seven months after J was taken into care, mother underwent a psychological evaluation by Dr. Basham. As pertinent here, Basham diagnosed a personality disorder not otherwise specified, with narcissistic and borderline features, as well as intermittent explosive disorder[6] and a rule-out diagnosis of substance abuse. He

---

vague and circumstantial and at times tangential in the group setting," mother did not deny that assessment but offered no explanation. Burgess's notes from that visit indicate that a psychological evaluation might clarify issues and that mother presented with traits of schizotypal personality disorder. He testified that people with that disorder have "a somewhat strange presentation" and "tend to not be fully socially connected." However, his suspicion about schizotypal personality disorder did not lead him to prescribe any different treatment, because there is "no treatment of choice" for that disorder.

Similarly, the parenting trainer, Barnes, testified that other parents in the class became concerned by strange behavior such as

"erratic going from one subject to another without any change, talking about things in front of people that maybe you wouldn't normally talk about in front of other people, getting upset, raising your voice. I mean, people who are recovering from methamphetamine abuse, they see things and they think things. People would always say something about drugs or something like that, when [mother] walked out of the room."

After Barnes heard that mother had had a positive urinalysis (UA), she suspended mother from the parenting class. When mother returned after two clean UAs, however, there was no noticeable change in her strange behavior.

[5] Wagner's assumptions about possible substance abuse were not without foundation. At intake for the drug and alcohol program, mother disclosed use of methamphetamines and prescription pain medication. Mother had two positive UAs and one dilute UA, apparently through DHS, though she had no positive UAs in her drug treatment program.

At trial, Wagner acknowledged that she had no concerns about mother's present sobriety, given the results of her UAs, and Dr. Basham, who conducted a psychological evaluation of mother, agreed that, if mother had had ongoing contact with professionals for about a year without indications of drug use, then drug use could be ruled out as a diagnosis.

[6] Intermittent explosive disorder is a behavioral diagnosis indicating that a person is being violent and has problems controlling her anger. Because anger problems tend to be persistent, with gaps between incidents, Basham typically looks for a two-year period without incidents of domestic violence before saying that an intermittent explosive disorder is in remission. He opined that DBT, particularly following an anger management program, can help people with borderline personality disorder deal with their anger.

explained that personality disorders are "long-lived, persistent, difficult-to-treat problems, and they're also pervasive. They're not simply one narrow area of functioning, but are part of the whole broad picture of the individual's functioning." The specific dysfunctional traits related to a personality disorder may be measured by psychological tests, but the tests alone cannot diagnose a personality disorder.

Basham explained that, in the diagnostic process, he looks first at a client's history to identify problems in functioning. Mother's family history is painfully chaotic.[7] After examining a client's history, in order to determine which particular disorder or mixture of disorders is the appropriate diagnosis, Basham looks at assessment tests and patterns of behavior. In mother's case, he saw a high score on grandiosity, which is a good measurement of narcissistic personality traits; he also considered mother's history of anger management issues, which can be a reflection of both borderline and narcissistic personality traits.

---

[7] For example, mother, who was 22 years old when she gave birth to J, has a very difficult relationship with her own mother. When she was 16, mother was sexually abused by her mother's boyfriend. After mother disclosed the abuse, her mother continued that relationship and discouraged mother from testifying truthfully in the prosecution of the abuser. Although mother underwent drug treatment as a teenager (having regularly used marijuana since age 13 and having experimented with other drugs), at times she had difficulty maintaining sobriety, in part because of her feelings about her mother's continuing relationship with the abuser and her mother's drug use in the family home.

When mother was 18, she pleaded guilty to assaulting her mother. However, despite a no-contact order and a restraining order, mother continued to live in her mother's home. Any time that mother and her mother fought, her mother would call the police and show them the restraining order, and they would take mother to jail for two or three days. Afterwards, mother would again return to live in her mother's home.

Despite testifying to such painful events, mother offered the view that people focus too much on negative things in her past: "I was always happy. I didn't have conflicted, strained, stressed relationships with my parents, with anybody I knew, with anybody I worked with, with any of my ex-boyfriends, we didn't have that there." In mother's view, her past does not matter.

Mother continues to have frequent and often volatile contact with her mother. Yet, mother does not believe that her mother presents any risk of harm to her children. Mother testified that she would have no hesitation leaving her children with her mother, "as long as she weren't on drugs or impaired, which she's not." Mother also testified that she has no friends and has no one to help her watch J other than her mother and grandmother.

Mother's case was "not the clearest case" as far as determining the nature of her personality disorder. Borderline traits appeared in her history of anger, her inability to regulate emotions, her weak boundaries in relationships (that is, confusing her own needs and desires with other people's needs and desires), and her poor choices in relationships. Narcissistic traits included mother's tendency to overestimate her abilities and to disregard the opinions and advice of others and her difficulty with empathy and with recognizing others' perspectives. Those traits appeared "in deflecting normative social influences and being determined to follow her own wants and desires regardless of what others think" and in anger problems, "where she becomes outraged over having to accommodate the * * * demands, wants, or needs of others."

Mother had no significant intellectual deficits, though Basham noted that others had reported her erratic behavior and that some of her comments during the evaluation were strange. Although no tests confirmed recent drug abuse by mother, Basham wrote in his report that "[d]rug abuse would be one reason for her unusual demeanor and problems with comprehension in her parenting class a couple of months ago. However, her narcissistic personality traits leave her prone to behave in an unconventional manner * * *."

In his written evaluation, Basham expressed the view that individualized parenting training would probably benefit mother, that her anger management program was a good resource for her and the service most likely to improve her functioning, and that she should continue with drug treatment and regular UAs. He noted that mother was "not reporting or showing interest in mental health treatment for other personal problems."

Mother's strange behaviors continued after the evaluation. She behaved erratically during some visits with J,[8]

---

[8] During one visit, mother erratically shifted from quiet to loud, wrapped her coat tightly around J and held him as if he were an infant (he was then 21 months old), gave him coins (which she was instructed are a choking hazard), and began dancing and watching herself in the mirror. Wagner asked mother to do a UA, but mother did not follow through. At another visit, she danced around while J was

and her behavior in her parenting class alarmed her parenting trainer, Barnes, who discharged mother with an evaluation that she had made no progress.[9] Barnes testified that her greatest concern was that mother "seemed to think [J] was capable of doing things that he was not capable of" and seemed to take very personally and become angry about things that J, because of his age, did without any intent to upset mother. She identified that type of misperception as a significant risk factor for child abuse.

In January 2008, 10 months after J was taken into care, mother had a domestic violence incident with her then-boyfriend, T. S., whom she had met in her parenting class.[10] The incident began when mother poured a beverage on T. S. At the time, mother reported that she did so because he was being verbally and psychologically abusive and that he then responded by crushing a can on her throat, holding her up against a wall, and forcing her to stay the night. At the termination hearing, mother testified that she exaggerated the incident so that she would have something to write about in her anger management journal and thus would be able to finish the class sooner. Mother denied continuing the relationship after that incident, but changed her account when confronted with the fact that A was conceived about a month later.

Concerned that DHS might be missing something that could help mother, Wagner sought further guidance from Basham. He continued to think that mother had a personality disorder that explained much of her behavior, but

_playing with his grandmother and great-grandmother and then abruptly stopped and yelled, "Hey, fuckers."_

[9] Mother submitted an assignment that was supposed to be a letter for her child to read later but that was totally inappropriate for that purpose. When Barnes tried to talk with mother about the assignment, mother became angry and confused and, according to Barnes, told her that "she had already taken this class four times before, and that I should know that, and that her records were police-sealed, so I couldn't see them." Mother became really angry with Barnes "about something I did to her in high school," although Barnes did not attend high school with mother. Later, after discussing the matter with her supervisor, Barnes decided to close mother's case. In Barnes's view, mother "needed some mental health assessments, and * * * some one-on-one special needs parenting classes." Mother exhibited no positive change as a result of the class.

[10] T. S., who has mental health issues and a history of drug abuse, is the father of mother's younger child, A, who was born in November 2008.

remained uncertain of her specific diagnoses. Basham again recommended that the possibility of substance abuse be closely monitored.[11] He noted "a strong narcissistic quality to her dealings with others, seen in her tendency to escalate or become domineering, but she is also prone to become confused or irrational, which is not part of the usual pattern of narcissistic personality." Basham observed that mother's personality disorder

"does not explain her seemingly delusional behavior. I would recommend that she have [a] psychiatric assessment addressing the question of major mental illness and the reasons for her disturbed thinking. Such would provide an additional professional perspective on her and may reveal more about the reasons for her concerning behavior. Such an assessment could also address the question of whether her problems are ones that are likely to respond to psychotropic medications."

Given mother's lack of progress in services, Basham concluded that her "only real prospect for improvement in the near future is identifying a mental health problem that can be effectively treated with medications."

At a permanency hearing held in March 2008, one year after J was taken into care, the juvenile court found that DHS had made reasonable efforts to enable J's safe return home. The court found that mother had been involved in services but had not "shown sufficient stabilization or enough ability to apply what has been taught in [her] services. Mother seems to have a mental health impairment; although she's attending [mental health services], there doesn't seem to be an improvement in that regard. Her [psychological evaluation] addendum recommends a psychiatric assessment." The court ordered mother to participate in such an assessment, for which DHS was to provide a referral, and ordered DHS to refer mother to a hands-on parenting class and to explore adoptive placements.

DHS had made a hands-on parenting class referral a month before the permanency hearing, when it referred

---

[11] Wagner testified at the termination hearing that she had monitored mother's UA results and did not have any remaining concern about mother's sobriety.

mother to the Volunteers of America (VOA) special needs parenting program, although it was an unusual referral for a person with normal intellectual functioning. Wagner thought that the more hands-on approach used in the VOA program might be easier for mother to understand. While waiting for an opening in the program, mother had eight sessions of one-on-one parenting training with a therapist, Kuntz. She found that mother was not able to multi-task and that her focus was sometimes scattered. Although mother tried hard and made some progress, Kuntz had continuing concerns about mother's inconsistency from one session to the next, the amount of coaching required, and mother's failure to pick up on J's cues. Kuntz testified that she would have expected a greater level of skill, given mother's prior participation in a parenting program.

In May 2008, 14 months after removing J from mother's care, DHS filed a termination petition. After the petition was filed, mother's attorney directed Wagner not to speak to mother about services or issues other than visitation.

The following month, Dr. Larsen issued a report on his psychiatric alcohol and drug evaluation of mother. He described mother as "markedly dysfunctional," with "essentially no insight into the nature of her behavior" and little expression of emotional concern for child. In addition to diagnosing drug abuse based on mother's self-reported history, Larsen diagnosed a severe personality disorder, not otherwise specified, predominantly narcissistic and borderline in type. The narcissistic traits included mother seeing herself in somewhat grandiose terms, with a sense of entitlement and a tendency to blame others. The borderline behaviors were evident in her history of unstable romantic relationships, impulsive and sometimes inappropriate behavior, and angry outbursts. In Larsen's view, mother had "learned to self-medicate her underlying behaviors and inadequacies thereby ignoring or avoiding taking responsibility for her life." Larsen's written recommendation was this:

> "The only effective intervention will be intense individual therapy. These patients sabotage attempts to help, as again they lack the insight and judgment to participate. Until she

accepts responsibility for her behavior and understands that she must change, we can expect to see little or no improvement.

"* * * [Mother] suffers from a severe personality disorder which includes explosive behavior. We do know that low dose atypical antipsychotics sometimes help modulate such behaviors, if it is combined with individual psychotherapy as described above. * * * [I]f [DHS] can provide long-term individual therapy and [mother] agrees to participate, this is perhaps the only avenue of appropriate intervention."

Around the same time and at her attorney's suggestion, mother sought individual therapy with Burgess, who previously had provided drug and alcohol treatment to her. Burgess tried to establish goals with mother and to help her engage in therapy, but that proved difficult. Mother testified that she went to counseling because someone suggested that she do so, but did not have any idea of what she wanted from counseling. According to Burgess, mother seemed to think that others' perceptions were inaccurate and that she was essentially doing fine. Indeed, after a couple of months, mother told Burgess that she felt that she had no issues to address, so they agreed to end therapy.[12] Burgess's working diagnosis was that mother had a personality disorder, most likely a borderline personality disorder with narcissistic traits. Basham explained that Burgess's experience—that mother was unable to identify problems and engage in lasting therapy—was consistent with a personality disorder.

Meanwhile, not long after beginning her sessions with Burgess, mother began attending the VOA special needs parenting class. She completed 18 out of 20 classes and successfully completed the program. Rose, the VOA parenting consultant, testified that mother had trouble understanding the shortness of J's attention span, as well as "what's going on in [J's] mind when he has a certain behavior, * * * how developed his thoughts are, that she might expect that

---

[12] Mother returned to Burgess in the month before trial, after staff at a prenatal clinic recommended counseling. Although they discussed reengaging in therapy, Burgess discovered that mother was already in DBT (which mother had begun a month after leaving therapy with Burgess), so concurrent therapy would be inappropriate. Mother had not informed her DBT therapist of her appointment with Burgess; he referred her back to her DBT therapist.

he's thinking something more deeply and more fully than what his cognitive abilities are at his age. And also ideas about what other people might be thinking." Mother had difficulty internalizing the information that her concerns about J's behavior (and how his behavior would affect other people's opinion of her) did not reflect age-appropriate expectations. Although Rose did not see mother engage in excessive discipline, she thought that mother appeared to be puzzled and did not know how to manage J. Mother sometimes misperceived J's normal behavior, such as grabbing toys or being defiant, as character flaws, a misperception that persisted. Although J was usually cooperative and actually presented fewer parenting challenges than the average two-and-a-half-year-old, over time he learned to push limits with mother.

In September, a month after leaving therapy with Burgess, mother completed her anger management program—that is, mother violated the confidentiality of another member of the group and was not allowed to continue participating in the group, but was allowed to leave as having completed the program. The discharge summary indicates that, "with limitations to her progress, she has completed the minimum requirements of [the] group." The summary goes on to note that mother has "cognitive limitations, possibly mental health issues," but "despite these disadvantages, she has progressed greatly."

That same month, on the advice of her attorney, mother began DBT, which combines group therapy teaching specific skills and individual therapy focusing on applying those skills in specific personal situations. Mother's DBT therapist, Huygen, described DBT as being "about managing emotions and problems and relationships more effectively." DBT is used primarily to treat borderline personality disorder and also is effective for anger management.

The program in which mother is enrolled begins with a six-month phase of individual and group therapy, followed by a second six-month phase of weekly group therapy and individual therapy every other week. By the time of the termination hearing, mother had had 10 to 12 sessions with Huygen. Mother initially was very closed and provided only

short answers, but after a few sessions, she began to open up. Huygen reported that mother was very engaged and appropriate in group sessions. However, mother was not honest with Huygen about events that precipitated J's removal, nor did she disclose the domestic violence incident with T. S. As she does with any client, Huygen relied completely on mother's self-report to measure her progress. Huygen explained that the focus in DBT is on "the current situation and dealing with things that are happening right now."

Mother identified DHS involvement and custody of her son as the main issues to be addressed in DBT, but Huygen understood mother to believe that there was no longer any reason for J or A to be out of her care. Huygen thought that DBT was very helpful to mother, that many of her problems related to a lack of skills, and that her prognosis after two months of DBT was good. She saw mother as very motivated and as making progress. Huygen expressed the view that, if mother continued as she had done in the two months before the termination hearing, she likely would complete the DBT program in a year, although it could take longer than that. Huygen diagnosed mother with borderline personality disorder. Huygen did not see narcissistic traits but expressed the view that, in any event, DBT could be useful for people with narcissistic traits.

As noted above, neither Basham nor Larsen diagnosed mother with borderline personality disorder; rather, both diagnosed a personality disorder not otherwise specified, with narcissistic and borderline traits. Burgess diagnosed mother with a personality disorder, most likely borderline personality disorder with narcissistic traits. In Basham's view, DBT is not particularly effective in treating narcissistic traits[13] and would not help with the problem, consistently identified by service providers working with mother, that mother misperceived J's behavior and even saw J as acting with malice. According to Basham, DBT skills would not correct a problem with "being able to understand other people,

---

[13] Larsen took a slightly different view, testifying that DBT could be "somewhat helpful" with narcissism but would typically take at least 18 months' intensive therapy.

or seeing things through their eyes." He testified that DBT simply is not designed to address problems with perception or a parent's inability to understand her child.[14]

Basham further opined that DBT would not cure or make up for disrupted socialization in mother's own life, even though it could help her to develop coping skills to avoid extreme emotional reactions. He testified that children who do not receive validation experience stunted social and emotional development that affects many areas of life, such as social skills, the ability to understand others, and the ability to understand and deal effectively with one's emotions. He thought it very likely that mother's personality disorder developed as a result of disrupted socialization in her own life. Consistently with Basham's view, Larsen saw evidence that mother had experienced a "lack of close, caring parenting as she grew up."

The termination hearing occurred in December 2008, a few months before J turned three. Mother had a clean, one-bedroom apartment, had been successfully employed in a restaurant for about a year before the hearing, and was expected to receive a promotion in the near future. Mother gave birth to her younger son, A, about a week before the hearing, and she hoped to have both J and A returned to her.

We turn to the evidence regarding J. J has remained in his paternal grandparents' home since April 2007 (20 months at the time of the termination hearing) and is doing well. His grandparents wish to adopt him. J appears to recognize mother as someone with whom he visits, but he does not appear to have a very strong bond with her; although he is comfortable with mother's hugs during visits, he does not go to her for emotional reassurance or exhibit an emotional let-down at the end of visits. According to Wagner, J is starting to "talk about when he's getting big" and "wants to hear things about how things are going to happen for him,

---

[14] In Basham's view, the belief among mental health professionals is that DBT addresses problems with controlling emotions as well as some other symptoms of borderline personality disorder; it does not treat the disorder but is widely believed to reduce its symptoms. By contrast, Huygen testified that DBT can essentially cure borderline personality disorder.

and he needs to be able to have an answer to that." Wagner thought that waiting an additional year for permanency would be harmful to J, though she did not elaborate further and the record contains no additional information on that point.

The juvenile court found that mother suffers from an emotional or mental illness that renders her incapable of providing proper care for J. The court found Basham and Larson to be more persuasive than Huygen because they had more historical information than she did. The court also noted that the evidence concerning mother's conduct was consistent with her testimony at the hearing and that mother "says things that do not make sense and clearly lies when it suits her and some of her answers to questions were clearly not responsive to the questions asked."

The court identified mother's failure to effect a lasting adjustment as the key issue. The court found that mother had participated in every service asked of her but had not benefitted from the services in light of her violent conduct with T. S. and her inability to identify an issue to work on when she returned to counseling with Burgess. In the court's view, it was "clear that all she has gained from services are words to parrot back but no indication that anything has been learned or internalized to impact her daily life in order for her to safely parent a very bright and engaging almost three year old." The court entered a judgment terminating mother's parental rights, and she appeals.

■        We begin with the legal framework for termination. The grounds for termination, unless admitted, must be established by clear and convincing evidence. ORS 419B.521(1). ORS 419B.504 sets forth possible grounds for termination:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)   Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

Under that statute, we first consider whether the parent is unfit—that is, whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child. If so, then we consider whether it is improbable that the child may safely be returned to the parent within a reasonable time. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001). A "reasonable time" is a period "that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). If the grounds for termination are proved, then we consider whether termination is in the child's best interest. ORS 419B.500.

■      Here, mother concedes that, despite making some progress, she was not a minimally adequate parent at the time of the termination hearing. She contends, however, that the juvenile court erred in terminating her parental rights because DHS failed to make reasonable efforts to enable her reunification with J and that, with proper treatment, she will be able to safely care for J. Mother relies on the fact that, although DHS had identified mental health as an issue, it did not refer mother to individual mental health treatment. In mother's view, DHS "treated [her] like a client with no mental health problems." Mother also contends that J could be reintegrated into her home within a reasonable time because all she needs to do to become a minimally adequate parent is to successfully complete her DBT program, which she could

do within a year. That period, she argues, is not unreasonable, because J has no special developmental needs and is living in his proposed adoptive home. She also contends that she has made significant progress by becoming sober and employed and obtaining a suitable home. Finally, mother contends that termination is not in J's best interests, because she and J have a meaningful relationship that should be maintained.

DHS responds that it made reasonable efforts to provide services to mother and that the record does not demonstrate that DBT is an effective treatment for mother. DHS contends that J's reintegration into mother's home is improbable within a reasonable time because, even if DBT might make her able to parent in the future, Larsen thought it could take as long as 18 months for mother to complete DBT, and J had already been out of mother's care for almost two years by the time of the termination hearing. In light of mother's problems and the difficulty of treating them, DHS argues, termination is in J's best interests. J agrees.

We begin with the reasonable efforts issue. The reasonableness of DHS's efforts depends on the particular circumstances of the case. *State ex rel Dept. of Human Services v. R. O. W.*, 215 Or App 83, 99, 168 P3d 322 (2007). Here, we conclude that, by providing services that appeared well-suited to mother's difficult-to-identify needs, DHS made reasonable efforts.[15]

At the beginning of the case, DHS promptly provided services designed to address the issues that led to J's removal from mother's care: programs for anger management, drug and alcohol treatment, and parenting skills. Mother's struggles in those programs initially appeared to be related to substance abuse, a problem for which she was already receiving treatment.

Mother's problems continued after she attained sobriety, and DHS obtained a psychological evaluation and a

---

[15] J contends that reasonable efforts need not be shown in order to terminate mother's parental rights on the basis of mental or emotional illness, pursuant to ORS 419B.504(1). We need not decide that issue, however, because we conclude that DHS's efforts were reasonable.

follow-up analysis from Basham. Basham indicated that mother's anger management program was the service most likely to improve her functioning and also recommended continuing attention to substance abuse issues and an individualized parenting program. Noting that mother did not recognize any issues to work on in therapy, Basham did not recommend individual mental health therapy for mother. (And Basham's evaluation was, in fact, borne out by Burgess's later, unsuccessful efforts to provide individual mental health therapy.) In the follow-up to his evaluation, Basham recommended a psychiatric assessment. In light of Basham's recommendations and mother's difficulty with the first parenting program in which she participated, DHS provided services that seemed suited to mother's needs: individual parenting training with Kuntz, the special-needs parenting program through VOA, the continuation of the anger management program, and a psychiatric drug and alcohol evaluation with Larsen.

By the time that Larsen recommended that "perhaps the only avenue of appropriate intervention" would be—if mother agreed to participate—long-term individual therapy, the termination petition had already been filed. DHS was no longer able to speak with mother about services. Although mother, commendably, chose to pursue therapy with Burgess after the filing of the termination petition, that therapy ended unsuccessfully after a few months, because mother was not able to identify any goals for the therapy.

In short, DHS made reasonable efforts to address mother's issues: offering a range of services; providing psychological and psychiatric evaluations to identify the source of mother's problems and possible solutions; and offering new, more individualized services when group services were unsuccessful. In light of the information that DHS had at each stage in the case, its efforts were reasonably calculated to address mother's issues and to enable the safe return of J to mother. Although the offered services were not entirely successful, DHS made reasonable efforts by offering them. *R. O. W.*, 215 Or App at 105.

■ We next consider whether J's reintegration into mother's home is improbable within a reasonable time due to

conduct or conditions not likely to change. Here, the most optimistic forecast was Huygen's testimony that mother was likely to complete DBT in a year and thus address what Huygen diagnosed as a borderline personality disorder. Even if mother completes that DBT program in a year, however, it appears improbable that the therapy will be sufficient to address the full range of mother's problems.

The other experts who evaluated or provided therapy to mother—Basham, Larsen, and Burgess—diagnosed her with narcissistic traits as well as borderline traits. Neither Basham nor Larsen diagnosed mother with borderline personality disorder; rather, they diagnosed a personality disorder not otherwise specified, with narcissistic and borderline traits. Although Burgess thought that mother most likely had borderline personality disorder, he too diagnosed narcissistic traits as part of mother's disorder. In light of the more complete history that was available to those experts, we find their opinions more persuasive than Huygen's as to the nature of mother's personality disorder.

Here, the record indicates that DBT is not likely to be effective in resolving some of the obstacles to mother's caring for J, including her misperceptions of J's behavior and her inability to understand him. Thus, even if mother were able to successfully complete DBT within a year, she still would not be prepared for J to return to her care. Although J does not have special needs, he had been in his grandparents' care for about 20 of the 33 months of his life by the time of the termination hearing. With no indication of when mother might be able to safely care for him, return within a reasonable time is improbable.

Finally, we consider whether termination is in J's best interests. J does not appear to have a strong bond with mother, and he is doing well with his paternal grandparents, who wish to adopt him. We conclude that freeing J for adoption is in his best interests.

Affirmed.