Argued and submitted June 12, dispositional/permanency judgment as to father reversed and remanded, otherwise affirmed August 22; appellant-mother's confidential petition for reconsideration filed September 19, and respondent's response to appellant's petition for reconsideration filed October 12, allowed by opinion November 21, 2012
See 253 Or App 600, 292 P3d 565 (2012)

In the Matter of A. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

D. L. H.
and I. K.,
*Appellants.*

Linn County Circuit Court
J060417;
Petition Number 10136J

In the Matter of J. L. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

D. L. H.,
*Appellant.*

Linn County Circuit Court
J010086;
Petition Number 10137J;
A149947

284 P3d 1233

Megan L. Jacquot argued the cause and filed the brief for appellant D. L. H.

James A. Palmer argued the cause and filed the brief for appellant I. K.

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

This is a dependency case in which mother and father separately appeal the combined dispositional and permanency judgment of the juvenile court changing the permanency plan of the children, J and A, from reunification to adoption. In those dispositional/permanency judgments, the juvenile court determined that the Department of Human Services (DHS) had made reasonable efforts to reunify J with mother and active efforts to reunify A with mother and father. Because we conclude that DHS had failed to make active efforts to reunify A with father, we reverse in part and remand in part.

## I.  FACTS

The parties do not request that we exercise our discretion to review the case *de novo*, and we do not do so. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review of certain equitable actions); ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Instead, we review the juvenile court's legal conclusions for errors of law and are bound by the juvenile court's findings of historical fact as long as there is "any evidence" to support them, *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010), that is, so long as there was competent evidence from which the court reasonably could make the findings. *See Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 162, 61 P3d 918 (2003) (affirming the denial of a motion for directed verdict under the "any evidence" standard because "there was evidence from which the jury reasonably could conclude" that the defendant exercised actual control over a risk-producing activity). We state the facts consistently with that standard.

### A.  *Background*

Mother and father do not have an ongoing relationship but have one child together, A, who was born in 2006 and who was four years old at the time of the permanency hearing. Mother has another child, J, who was 10 years old at the time of the hearing.[1] The record does not indicate who J's father is.

---

[1] Mother also has four other children, unrelated to father. Mother does not have custody of those children, and they are not subjects of this dependency case.

Father has been incarcerated in Snake River Correctional Institution since 2009 and is expected to be released in 2014. Father did not know that he was A's biological father until DHS established paternity in January 2010. Father is a member of the Comanche Nation in Oklahoma.

Because A's father is a tribal member, the legal standards applicable to the permanency plans for the children differ between A and J. The parties agree that the Indian Child Welfare Act (ICWA) applies to A because A is an "Indian child." 25 USC § 1901(4) (defining an "Indian child" to mean "any unmarried person who is under age eighteen and is * * * eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"). The parties also agree that ICWA does not apply to J. Therefore, DHS is required to prove "active efforts" toward family reunification with regard to A and "reasonable efforts" with regard to J. *See* ORS 49B.476(2).

Mother has had a long history of alcohol abuse and admitted that her alcoholism has created problems with her ability to care for her children. Over the last 20 years, she has undergone alcohol and drug treatment at various programs throughout Oregon. The incident that led to the children's removal from mother's care and, ultimately, mother's incarceration was alcohol-related.

On August 15, 2010, J was staying with his maternal grandparents. A was with his mother and his stepsister, L, and they were staying with mother's friend. L's father, A. L., stopped by the friend's house to see L. An unidentified young girl approximately 10 years old answered the door. A was crying and his shirt was soaking wet. A. L. could not locate mother in the home, and so, out of concern for A and his child, A. L. took the two children to the maternal grandparents' home. Mother called soon thereafter, learned that A was with the grandparents, and drove to the grandparents' home. Mother entered without permission and made her way to the upstairs bedroom where A was sleeping. She picked up A and attempted to leave the home. Grandmother and A. L., fearing that mother was intoxicated, blocked her path. While carrying A in one hand, mother hit grandmother and

For clarity and unless stated otherwise, when referring to mother's children, we refer to only J and A, who are subjects of this case.

pushed A. L. down the stairs. A, who was in mother's arms, observed the altercation. J did not witness the incident but heard the commotion from his bedroom. Mother left with A and damaged grandparents' door when she slammed the door shut. She also threw an empty beer can out of her car window as she drove away. Police arrested mother later that day, and DHS took the children under protective custody.

The court held a shelter hearing a few days later and took temporary custody of the children, placing them with the grandparents. Mother was convicted of fourth-degree assault of grandmother, reckless endangerment of A, and harassment of A. L. She was sentenced to 22 months in prison and is currently incarcerated at Coffee Creek Correctional Facility.

DHS filed a petition alleging that mother had endangered the children through her actions on August 15, 2010, and, further, that mother's untreated drug and alcohol abuse impaired her ability to meet the health and safety needs of her children. As to father, the petition alleged that father was incarcerated for third-degree robbery and second-degree assault and was "currently unable to provide a home for [A]" and that father did "not have an established parental relationship with [A] and has never acted as a parent to [him]."

Father admitted the allegations in the petition concerning him. Mother contested the allegations against her, arguing that there was insufficient evidence to establish jurisdiction. On February 22, 2011, after a hearing, the juvenile court entered a jurisdictional judgment making J and A wards of the court.[2] Shortly after the jurisdiction hearing, DHS developed a "Child Welfare Case Plan," stating that the primary permanency plan was to reunify the family and the concurrent alternative plan was adoption.

B.  *Dispositional / Permanency Hearing*

The court scheduled a dispositional hearing for both parents on February 25, 2011, but DHS sought to consolidate the dispositional hearing with a permanency hearing. ORS 419B.470(5) ("[T]he court shall also conduct

---

[2] The jurisdiction hearing was originally scheduled for November 30, 2010, but after the court approved mother's motion to disqualify the juvenile court judge, the jurisdiction hearing was set over to January 3, 2011.

a permanency hearing at any time upon the request of [DHS.]"). The consolidated hearing was held on May 16, 2011, and continued to June 16, 2011. At the hearing, Dr. Ewell, a licensed psychologist who evaluated J and A, testified that the children were in need of permanency. DHS entered Ewell's evaluation reports of J and A into evidence. In those reports, he noted that J demonstrated an adjustment disorder with mixed disturbance of emotions and conduct.

DHS submitted a disposition report to the court outlining its efforts to reunify the family. Regarding DHS's effort to reunify mother and J, DHS offered mother a psychological evaluation, permitted mother to write letters to her children, made phone calls to mother's prison counselor, visited mother in the Linn County Jail and offered her an alcohol/drug evaluation (which mother declined), called mother, and provided copies of letters from mother to J's therapist. As to DHS's efforts to reunify A with mother, the disposition report stated that DHS offered mother a psychological evaluation, approved mother writing letters to her children, made phone calls to mother, and provided copies of mother's letters to A's therapist. As to DHS's efforts to reunify father with A, DHS stated in the disposition report that it allowed father to write letters to A, contacted the Comanche Nation regarding the concurrency plan, delivered three books to A about the Comanche nation, called father's prison counselor, called the child's therapist, called father's relatives, exchanged letters between father and A through A's maternal grandparents, met with A's therapist and foster parents to discuss visitation, requested photographs from father's relatives, and forwarded letters from father to A and A's therapist. The report noted that, "[i]t is unknown at this time how much progress [father] is making as he is currently incarcerated at Snake River Correctional Institution."

C.  *Mother's request for visitation and services*

Mother requested that the Department of Corrections (DOC) allow A and J to visit her in prison. DOC denied mother's request because the two children were "crime victims." OAR 291-127-0230(7) ("A person is ineligible to visit an inmate confined in a Department of Correction facility if the person is a victim of the inmate's

crime(s) of conviction, past or present."). A is a victim of mother's current crimes. Mother was previously convicted of misdemeanor assault of J, so J is also a victim.

DOC indicated that it would be willing to revisit mother's request for visitation if "a positive recommendation is received from DHS." DHS informed DOC by letter that it "would like to have visitations cleared for the children and mother," but would not pursue visitation because the children's therapist, Dr. Monahan, did not recommend that the children visit mother in prison. Monahan testified that J did not want to visit mother and "[f]orcing [J] to visit his mother in prison against his wishes is likely to increase any feelings of powerlessness, victimization, and anger and fear that he may be experiencing." Monahan could not recommend visitation until J could begin to talk about his feelings about his mother and resolve some of those issues. As to A, Monahan testified that he's too young to be exposed to "that intimidating environment of the prison." On cross-examination, Monahan testified that she had never visited Coffee Creek, contacted the staff concerning visitation, or read any DOC material regarding inmate visitation. She further testified that, if the court ordered A to visit either parent in prison, she could prepare A for the visits by taking progressive steps to make him feel more comfortable. Apparently, A was not aware that mother was in prison until a week before the permanency hearing. When Monahan talked to A about that, A quickly changed the subject. Because of A's age, Monahan said that it was difficult to go into depth about that subject because, as a four year old, A is focused on what is in front of him presently. Monahan explained that very young children are usually extremely anxious when presented with a prison environment and have difficulty talking about their fears. They have difficulty understanding why their parents are incarcerated and often come to fear law enforcement, blaming them for their parents' incarceration. Monahan did not completely rule out visits, but recommended that when A is six or seven years old, an in-person visit may be more appropriate.

Mother testified that she requested additional services from DHS, but learned that she did not qualify for DOC's alcohol and drug treatment programs because her

automated criminal risk (ACR) score was too low. DHS called DOC to inquire about offering additional services to mother, but a DOC prison counselor replied that mother "is not eligible for [alcohol/drug] treatment or assessment as her ACR[] score is showing she is not eligible. * * * [I]t does not matter if DHS offers her an [alcohol/drug assessment] as it wouldn't happen and that [DOC] will not allow that to happen, she is not eligible." Nonetheless, the DOC counselor testified that mother had participated in Alcoholics Anonymous (AA) in prison, but she was dropped from the program because her court appearances made her miss sessions. At the time of the hearing, she was on the waiting list to reenter AA. Mother also enrolled in a parenting program and became involved in Girl Scouts with L, her youngest daughter.

In a letter opinion, the juvenile court determined that DHS had made reasonable efforts to reunify J with mother and active efforts to reunify A with mother and father. It also determined that mother and father had made insufficient progress to make it possible for the children to return to their home. Additionally, the juvenile court found that mother would not likely make significant progress within a reasonable time to enable her to regain custody of J and A:

> "It is unlikely that [mother] could make any significant progress in a reasonable period of time. She remains incarcerated for the time being. She will remain in prison until February 2012. She will be on post prison supervision with restrictions from visiting her victims for two years after her release. [J] will not visit her in prison. [A] is restricted from visitation. The credible testimony of the only psychologist in this case is that treatment of [mother]'s condition will take years. It is reasonable to infer from this testimony that she cannot provide a safe and nurturing home to [her children] during that period of time."

The juvenile court ordered the permanency plan to change from reunification to adoption. Mother and father appeal.

## II. ANALYSIS

Mother and father both argue that the juvenile court erred in concluding that DHS had made "active efforts" to reunify A with the family, as ICWA requires, and

mother also argues that DHS failed to make "reasonable efforts" to return J to her home, as Oregon law requires. Additionally, in mother's first assignment of error, she argues that the trial court erred in ordering the initial permanency plan for the children to be adoption without first ordering reunification. Finally, mother argues in her third assignment of error that it was error for the juvenile court to conclude that the children could not be returned to her custody within a reasonable time because her prison release date is within four months of the entry of judgment.

DHS responds that there is sufficient evidence in the record to support the juvenile court's conclusion that DHS had made "active efforts" to reunify A and "reasonable efforts" to reunify J. As to mother's contention that the juvenile court should have ordered reunification before ordering adoption, DHS asserts that mother misstates the record and that the juvenile court changed the permanency plan from reunification to adoption. Finally, DHS contends that it was not required to prove that the children could not be returned to mother within a reasonable time.

A. *The case plan*

We begin our analysis by addressing mother's contention that the juvenile court erred in "ordering adoption as the initial [case] plan before ordering reunification, absent aggravating circumstances." We understand mother's position to contain two arguments. First, she contends that, after a dispositional hearing, if the juvenile court removes the children from the family, the court is required to enter reunification as the primary permanency plan. Second, she argues that there had never been a plan for reunification of the children with her. On that basis, she suggests that the court's judgment concerning the permanency plan is invalid.

Mother does not cite, and we could not find, any statute or rule that requires the juvenile court to enter an order specifying reunification as the initial case plan at a dispositional hearing. Except in cases where the parents engaged in extreme conduct,[3] the state's policy is "to offer appropriate reunification services to parents *** to allow

---

[3] "Extreme conduct" includes, but is not limited to, rape, sodomy, or sex abuse of a child, intentional starvation or torture of a child, abuse or neglect resulting

them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5). Consistently with that policy, following a dispositional hearing, if the juvenile court removes a child from the home or orders that the child continue in state care, the court is required to make the following written findings:

"(a) Removal of the ward from the ward's home or continuation of care is in the best interest and for the welfare of the ward;

"(b) *Reasonable efforts, considering the circumstances of the ward and parent, have been made to prevent or eliminate the need for removal of the ward from the home or to make it possible for the ward to safely return home.* In making this finding, the court shall consider the ward's health and safety the paramount concerns; and

"(c) Diligent efforts have been made to place the ward pursuant to [the child placement statute]."

ORS 419B.337(1) (emphasis added). In addition, if the court awards custody to DHS, ORS 419B.340(1) places additional requirements on the juvenile court:

"If the court awards custody to [DHS], *the court shall include in the disposition order a determination whether the department has made reasonable efforts, or if [ICWA] applies, active efforts to prevent or eliminate the need for removal of the ward* from the home. *If the ward has been removed prior to the entry of the order, the order shall also include a determination whether the department has made reasonable or active efforts to make it possible for the ward to safely return home.* In making the determination under this subsection, the court shall consider the ward's health and safety the paramount concerns."

(Emphasis added.) And, ORS 419B.337(2) provides that the juvenile court "*may* specify the particular type of care, supervision or services to be provided by [DHS] to wards placed in the department's custody and to the parents or guardians of the wards," and ORS 419B.337(3) states that the court "*may* make an order regarding visitation" by a parent. (Emphasis

in the death of or serious physical injury to a child, or previous involuntary terminations of the parent's rights to another child. ORS 419B.502.

added.) Further, ORS 419B.343(1) requires DHS to "take into consideration recommendations and information provided by the committing court" before it places the child in any facility to ensure effective planning for the child. Thus, following a dispositional hearing, there is no requirement for the juvenile court to enter an order specifying that reunification is the case plan, although for prudential reasons, such an order may be desirable after the court reviews the plan. Rather, where the child was in DHS's temporary custody, as in this case, the court must make written findings as to the best interests of the child, that DHS made reasonable or active efforts to eliminate the need for the child's removal, and that DHS made reasonable or active efforts to make it possible for the child to safely return home.

As a factual matter, we also agree with DHS that the record does not support mother's contention that there was never a case plan for reunification. In this case, at the time of the dispositional/permanency hearing, the record reflects that the parties were operating under the DHS Child Welfare Case Plan in the record. That case plan listed the primary plan as reunification and a concurrent plan as adoption and stated that DHS would have to request a change of the plan to adoption. After combining the dispositional hearing and permanency hearing, the court issued a letter opinion finding that DHS had made reasonable efforts to reunify J with mother and active efforts to reunify A with mother and father. The juvenile court followed the statutory requirements for findings of reasonable and active efforts following a dispositional hearing. Accordingly, we reject mother's first assignment of error.

B. *DHS's efforts to safely return the children to their home*

We next address whether DHS established at the permanency hearing that it had made the necessary reunification efforts required by ORS 419B.476. That statute provides, in part:

"(2)   At a permanency hearing the court shall:

"(a)   If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made *reasonable efforts* or, if the Indian

Child Welfare Act applies, *active efforts* to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.476 (emphasis added). Thus, to change the permanency plan from reunification to adoption, the juvenile court must make two findings. First, the juvenile court must find that DHS has made reasonable efforts to reunify the family or, if ICWA applies—as it does with A—active efforts to reunify the family. Second, the juvenile court must find that the parent has not made sufficient progress to allow the child to return home safely. *State ex rel Juv. Dept. v. C. D. J.*, 229 Or App 160, 164-65, 211 P3d 289 (2009).

Neither parent challenges the juvenile court's determination that the parents failed to make sufficient progress to safely reunify the family. Rather, mother contends that DHS failed to make reasonable efforts to reunify J with her, and both parents contend that DHS failed to make active efforts to reunify A with them. Thus, our task is to determine whether the erred in determining that DHS had made reasonable efforts to reunify J with mother and active efforts to reunify A with mother and father.

1. *Active efforts to return A to mother*

Because A is eligible for membership with the Comanche Nation of Oklahoma, DHS must do more to attempt to reunify A with his parents than it must do to reunify J with mother. As we explained above, when ICWA applies, ORS 419B.476(2)(a) requires the juvenile court to determine whether DHS made "active efforts" to reunify the family. "Active efforts" requires more than "reasonable efforts." *Dept. of Human Services v. K. C. J.*, 228 Or App 70, 74, 207 P3d 423 (2009). We have defined "active efforts" to "impose on [DHS] an obligation greater than simply creating a reunification plan and requiring the client to execute it independently. Active efforts means that [DHS] must assist the client through the steps of a reunification." *State ex rel Juv. Dept. v. T. N.*, 226 Or App 121, 124, 203 P3d 262, *rev den*, 346 Or 257 (2009) (citing *A. M. v. State*, 945 P2d

296, 306 (Alaska 1997)).[4] The type and sufficiency of effort that DHS is required to make depends on the particular circumstances of the case. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506-07, 130 P3d 801 (2006).

In a case involving an incarcerated parent, although the type of services available to the parent may be limited, DHS is not excused from making the requisite efforts because of the parent's incarcerated status. *Id.* at 506. The *Williams* case both provides an example of DHS's failure to meet the minimum level of "reasonable efforts" to reunify a child with a parent who is incarcerated and suggests the kinds of efforts that DHS possibly could undertake, despite the parent's incarceration.

In *Williams*, the father, who was incarcerated from the time that DHS obtained jurisdiction to the time of the permanency hearing, appealed the juvenile court's conclusion that DHS had made reasonable efforts to return the child to the family. The record indicated that DHS's involvement with the father was virtually nonexistent. *Id.* at 507. At a dispositional hearing, the father had requested that DHS contact him and expressed his willingness to participate in any available services. *Id.* at 499. DHS had communicated with the father only twice; first to inform him to continue with whatever services were available in prison, and second to contact DHS when he was released. *Id.* at 507. We concluded that DHS's efforts were not reasonable given "father's relatively short incarceration, the lack of any information about his relationship with child, and his apparently imminent release from jail within four months of the permanency hearing[.]" *Id.* We also declined to delineate exactly the types of actions that would make DHS's efforts reasonable. Instead, we noted that DHS could have engaged in any number of activities, such as contacting the father

---

[4] Although *T. N.* uses "active efforts" in the termination setting, and, in this case, we must analyze "active efforts" in the permanency setting, the legislature's use of the same term throughout the juvenile code indicates that the term's meaning remains the same throughout. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *cf. Williams*, 204 Or App at 502 n 1 (indicating that the meaning of the term "reasonable efforts" in the juvenile code is the same when addressing termination of parental rights and permanency plans).

and investigating his relationship with the child, assessing the father's parental strengths and weaknesses, exploring services available to the father during his incarceration, incorporating those services into a service agreement, communicating with the prison counselor about the father's progress, investigating the possibility of visitation at the prison, and looking into whether the father's release date and the dependency time lines could make reunification possible. *Id.* 507-08. Although we applied the "reasonable effort" standard in *Williams*, and must apply the "active effort" standard for A, *Williams* suggests the minimum standard of effort that DHS must satisfy when a parent is incarcerated. *See K. C. J.*, 228 Or App at 74 ("'Active efforts' entails more than 'reasonable efforts.'").

This court has also examined the "active efforts" standard for reunification of a family in the case of an incarcerated parent. In *State ex rel Juv. Dept. v. Woodruff*, 108 Or App 352, 816 P2d 623 (1991), an incarcerated father of Indian children contended that the Children's Services Division, a predecessor agency to DHS, failed to offer him "remedial services and rehabilitation programs designed to prevent the breakup of the Indian family," in violation of ICWA.[5] *Id.* at 357. We applied the "active efforts" standard and rejected the father's contention because the father had been offered drug and alcohol treatment programs, anger management, and sex offender treatment, but declined to participate in those programs. *Id.* The *Woodruff* case informs us that DHS can meet the active efforts requirement if the incarcerated parent refuses to take advantage of the services that DHS offers.

In this case, mother contends that DHS failed to make active efforts because DHS did not contact her while she was incarcerated, failed to allow her to visit her children, and made no efforts to offer substance abuse treatment other than to offer a substance abuse *evaluation*. In response, DHS asserts that evidence in the record demonstrates that

---

[5] Under 25 USC § 1912(d), a provision of ICWA, DHS "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

DHS made active efforts to reunify A with mother. Given mother's circumstances, we agree with DHS.

The record includes DHS's disposition report, which indicates that DHS made "phone calls to mother," showing that DHS made an effort to contact mother. In addition, a DHS caseworker testified, and mother admitted, that the caseworker visited mother while she was in the Linn County Jail and offered her a substance abuse evaluation. Regarding visitation, DOC denied mother's request to allow both A and J to visit her because DOC prohibits victims from visiting an inmate. OAR 291-127-0230(7). Mother was convicted of recklessly endangering A and, several years ago, was convicted of assaulting J. DOC indicated that it would be willing to revisit mother's visitation request if "a positive recommendation is received from DHS." After consulting with Monahan, the children's therapist, DHS wrote back to DOC informing it that it "would like to have visitations cleared," but DHS could not recommend visitations because the children's therapist did not recommend the visits. Monahan testified that she could not recommend visitation because A was too young to be exposed to a prison environment and forcing J to visit mother would "increase any feelings of powerlessness, victimization, *** anger[,] and fear that he may be experiencing."[6]

Although mother was not able to visit her children, DHS communicated with DOC and with the children's therapist before concluding that it would not be in the children's best interest to recommend visitation. We consider DHS's investigation and evaluation of visits between mother and the children at the prison, including obtaining an opinion from the children's therapist, to be part of its efforts toward reunification of the family, even though DHS ultimately decided not to recommend such visits. *See K. C. J.*, 228 Or App at 84 ("The fact that DHS

---

[6] Mother criticizes Monahan's conclusion that A was too young to visit mother and argues that, had Monahan researched the Coffee Creek prison, she would have discovered that the prison has visitation facilities geared to visits by children of inmates and would have approved visits with mother. Mother's criticism misses the point of Monahan's concern. Monahan focused her attention on A's age as the deciding factor in her recommendation. Her letter to DHS recommended that mother and A continue their relationship via letters, and when A is a little older (six or seven years old), he could have visits in a prison.

and the tribe decided that it was not in the best interests of the children to travel [an hour to another city] for the visits [to see the father] does not mean that DHS's efforts were not 'active.'"); *see also Williams*, 204 Or App at 507-08 (noting that DHS could have engaged in a number of activities that might constitute reasonable activities such as looking into whether visitation at the jail was possible and appropriate).

As to mother's contention that DHS did not offer any services to her, the record indicates that DHS and mother's prison counselor communicated about mother's rehabilitative treatment options. Whether DHS has provided appropriate services and made active efforts is evaluated in view of the nature of the parent's problems. *Woodruff*, 108 Or App at 357. It is undisputed that mother has a substance abuse problem and that she is an alcoholic. The prison counselor told DHS that mother "is not eligible for [alcohol/drug] treatment or assessment as her ACR[] score is showing she is not eligible. * * * [I]t does not matter if DHS offers her an [alcohol/drug assessment] as it wouldn't happen and that [DOC] will not allow that to happen, she is not eligible." DHS's efforts were constrained by the DOC. Nonetheless, mother was able to access several services, including a parenting program, AA, abuse recovery ministry, a recovering addicts program, and a Girl Scouts program. Although DHS did not "offer" those services to mother, DHS case notes indicate that DHS discussed the services with mother's prison counselor. In addition, when mother was incarcerated at Linn County Jail, DHS offered her an alcohol/drug evaluation service, which mother declined.

Specifically, DHS communicated with mother's prison counselor, explored what services would be available to her while incarcerated, and investigated the possibility of visitation with A. DHS engaged in activities that we suggested were possible in *Williams*. Further, in light of *Woodruff*, mother cannot complain that DHS failed to make active efforts by not providing drug/alcohol services when DHS offered her a drug/alcohol evaluation in the Linn County Jail, and she refused to participate. *Woodruff*, 108 Or App at 357 (DHS made active efforts when it offered rehabilitative services and the father refused to participate);

*see State ex rel Juv. Dept. v. S. W.*, 231 Or App 311, 328, 218 P3d 558, *rev den*, 347 Or 446 (2009) (using psychological and psychiatric evaluations to identify source of the parent's problems and offer possible solutions). DHS otherwise had limited program options beyond those programs mother participated in while she was in prison. On this record, we conclude that the juvenile court did not err in determining that DHS made active efforts to reunify mother with A.

### 2. *Reasonable efforts to reunify J with mother*

For similar reasons, we agree with the juvenile court's conclusion that DHS made reasonable efforts to reunify mother with J. "Active efforts" requires greater effort than "reasonable efforts," *K. C. J.*, 228 Or App at 74; thus, if DHS made active efforts to reunify the family, it also made reasonable efforts. The record indicates that when DHS contacted the children's therapist or DOC to investigate visitation or to ask about services for mother, it did so for both A and J.[7] Because we conclude that DHS made active efforts to reunify A with mother, we also conclude that DHS made "reasonable efforts" to reunify J with mother.

### 3. *Active efforts to reunify A with father*

We turn to whether DHS made active efforts to reunify A with father. DHS must provide services best designed to meet the needs of the parent. *State ex rel Dept. of Human Services v. R. O. W.*, 215 Or App 83, 105, 168 P3d 322 (2007). The petition establishing jurisdiction provides that father does not have an established parental relationship with A and has not acted as a parent at all. To DHS's credit, it made an effort to establish a parental relationship between father and A, despite father's incarceration. In its disposition report, DHS indicated that it sent a letter to father approving written contact between father and A. DHS also contacted the Comanche Nation concerning the permanency plan and A's enrollment in the tribe, reconnected father with his relatives, exchanged letters and photographs between father and grandparents, gave A

---

[7] The only efforts that DHS made exclusively for A were contacting the Comanche Nation, sending books to A about A's Comanche heritage, contacting father's relatives, and exchanging letters between A and father.

cultural books and stories about the Comanche Nation, and held a meeting with father and his attorney.

However, the record does not show that DHS made any effort to help father act appropriately as a parent, *i.e.*, offer father parenting programs while in prison. Indeed, the Comanche Nation requested that father complete parent training, if available, and DHS reiterated that request to the court. To the extent that DHS contends that father's opposition to that request was a sufficient basis for the juvenile court to conclude that DHS had made active efforts to reunify A with him, we reject that contention. *Cf. Woodruff*, 108 Or App at 357 (DHS satisfied the active efforts requirement under ICWA for an incarcerated father who refused to participate in treatment programs DHS offered because he did not believe he had a problem that required treatment). DHS misconstrues the record. Father did not refuse to attend parenting training, as did the father in *Woodruff*. Rather, he objected to the court ordering him to attend. His attorney told the court that "if there is parent training available to him certainly he could choose to take advantage of that." The record is silent concerning DHS's efforts to provide parent-training services and whether those services were available to father. DHS's disposition report notes that DHS spoke to father's prison counselor but, unlike DHS's discussion with mother's prison counselor, there is no evidence regarding the topic of discussion. There was no testimony during the permanency hearing or in the record explaining whether DHS and father's DOC prison counselor discussed the availability of parenting programs. The only notes concerning father state "it is unknown at this time how much progress [father] is making as he is currently incarcerated at Snake River Correctional Institution."

We cannot ascertain from the juvenile court's letter opinion or from the record whether DHS or DOC has offered father any parental-training classes, or any other rehabilitative treatment programs to help father learn parenting skills. Accordingly, we conclude that DHS failed to make active efforts to reunify father with A. In light of our conclusion, we decline to address father's argument that an Indian expert, as required by ICWA, must be present during a dispositional hearing or permanency hearing.

C. *Returning the children home within a reasonable time*

We turn to mother's final assignment of error. Mother contends that (1) the juvenile court erred in concluding that the children and mother could not be reunited within a reasonable amount of time and (2) it follows from *Williams* that a juvenile court errs when changing the permanency plan to adoption even though an incarcerated parent is to be released from prison within a few months of the permanency hearing. 204 Or App at 507 ("Given father's relatively short incarceration, the lack of any information about his relationship with child, and *his apparently imminent release from jail within four months of the permanency hearing*, we conclude that DHS's efforts were not reasonable." (Emphasis added.)). DHS responds that the juvenile code does not require the court to make a "reasonable time" finding after a permanency hearing. Nonetheless, DHS asserts that the juvenile court made the correct finding that mother and child could not be reunited within a reasonable amount of time. We agree with DHS.[8]

As DHS contends, there is no statutory requirement under ORS 419B.476 or any other authority that requires the juvenile court to find that a parent cannot be reunited with the child within a reasonable time before the court changes the plan from reunification to adoption. As we discussed above, ORS 419B.476(2)(a), which lists the juvenile court's required determinations at a permanency hearing, does not require that kind of "reasonable time" determination. It provides instead that the juvenile court *shall* determine whether DHS made reasonable efforts to reunify the family, or active efforts if ICWA applies. ORS 419B.476(2)(a). Granted, under ORS 419B.476(4)(c), the trial court *may* order parents to participate in specific services "[i]f the court determines that further efforts will make it possible for the ward to safely return home within a *reasonable time*[.]" (Emphasis added.) In other words, it

---

[8] DHS first contends that mother did not preserve her third assignment of error. However, after reviewing the trial transcript, we conclude that the argument is preserved for appeal. In connection with mother's arguments concerning the adequacy of reunification efforts and her opposition to a plan of adoption, mother's attorney pointed out to the court that mother would be released from prison in six to seven months.

is within the juvenile court's discretion whether to order a parent to participate in services, if the court concludes that the parent can be reunified with the child within a reasonable time and with the aid of the additional services. But under ORS 419B.476(4)(c), the question is whether a court should order the parent to participate in services, not whether the court should change the permanency plan. And, to the extent that mother argues that a juvenile court cannot change a permanency plan based solely on her anticipated release from prison within six to seven months of the permanency hearing, we reject the argument.

In this case, the juvenile court did not make a determination that further efforts will make it possible to reunify the family. Rather, the juvenile court concluded the opposite; it concluded that "[i]t is unlikely that [mother] could make any significant progress in a reasonable period of time." The court also considered mother's upcoming release from prison, at least implicitly, by finding that, because treatment for mother's drug and alcohol addictions would take years, mother cannot provide a safe and nurturing home within a reasonable time. The record, including mother's substance abuse history and the testimony and report of the children's psychologist, supports the trial court's conclusions. Accordingly, we conclude that the trial court did not err when it changed the permanency plan without ordering specific services for mother and determined that mother and child could not be reunified in a reasonable time.

Dispositional/permanency judgment as to father reversed and remanded; otherwise affirmed.