Argued and submitted July 24, affirmed October 22, 2014, J. M.'s petition for review denied January 15, (356 Or 685), M. M.'s petition for review denied February 5, 2015 (356 Or 689)

In the Matter of L. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.
and M. M., aka M. H.,
*Appellants.*

Douglas County Circuit Court
1200227;
Petition Number 12JU215;
A156238

338 P3d 191

Angela Sherbo argued the cause for appellant J. M. With her on the briefs was Elizabeth Brownhill.

Peter Gartlan, Chief Defender, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant M. M.

Stephanie L. Striffler, Senior Assistant Attorney General, argued the cause for respondent. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Mother and father appeal a permanency judgment that changed the permanency plan for their child, L, from reunification to adoption. On appeal, parents first contend that the juvenile court violated their due process rights by admitting into evidence out-of-court statements contained within three reports without providing parents the opportunity to cross-examine the authors of those reports. Parents also challenge the court's determination that DHS made active efforts to reunify the family[1] and that, despite those efforts, parents had not made sufficient progress to allow L to be safely returned home. Mother also separately assigns error to the continued placement of L in relative foster care, contending that the change in plan from reunification to adoption is a "foster care placement" under the Indian Child Welfare Act (ICWA) and that the change in plan was erroneous without qualified expert testimony that mother's custody was "likely to result in serious emotional or physical damage" to L. *See* ORS 419B.340(7); 25 USC § 1912(e). We conclude that the admission of the reports containing out-of-court statements did not violate parents' due process rights. We further conclude that the juvenile court did not err in changing the permanency plan from reunification to adoption, and that the change in plan was not a "foster care placement" within the meaning of ICWA. Accordingly, we affirm.

None of the parties requests *de novo* review, and we decline to exercise our discretion to conduct such review in this case. *See* ORAP 5.40(8)(c) (stating that we exercise *de novo* review only in "exceptional" cases). Accordingly, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). In doing so, we "(1) assume the

---

[1] The court determined that L was an "Indian child" pursuant to 25 USC section 1903(4). Accordingly, the "active efforts" requirement of the Indian Child Welfare Act applies to this case. *See* ORS 419B.476(2)(a) (requiring the juvenile court at permanency hearings in ICWA cases to determine whether DHS has made active efforts to make it possible for the ward to safely return home).

correctness of the juvenile court's explicit findings of historical fact if th[ose] findings are supported by any evidence in the record; [and] (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact * * * the court implicitly resolved the issue consistently with that disposition[.]" *Id.* at 639-40. We state the facts consistently with that standard. We begin with the procedural background of the case, and then discuss facts as they are relevant to parents' arguments on appeal.

## I. BACKGROUND

DHS first became involved with parents in 2009 when the agency filed a dependency petition seeking jurisdiction over the couple's first child. Parents eventually stipulated to termination of their parental rights as to that child in October 2011, and that child was eventually adopted. L was born on August 1, 2012. DHS initiated an investigation the next day based on concerns that parents could not safely parent L. That investigation resulted in a "founded disposition" and L's immediate placement in relative foster care with the same family that had adopted his sibling. DHS filed a dependency petition two days after L's birth.

After DHS filed the petition, parents asked that Dr. Sweet conduct psychological evaluations of each parent in November 2012. Sweet diagnosed mother with low cognitive abilities and a personality disorder with passive-aggressive and dependent features and described mother as "not able to express any understanding of the concerns that the state has had about her." Sweet also noted that mother evinced no concern regarding father's chronically angry and threatening behavior. Sweet diagnosed father with borderline intellectual functioning, intermittent explosive disorder, a learning disorder, and a personality disorder with paranoid, avoidant, and passive-aggressive features.

On December 6, 2012, the juvenile court entered a judgment of jurisdiction based on parents' admissions to allegations that L's condition and circumstances endangered his welfare. Specifically, parents admitted that they lacked the parenting knowledge to ensure his safety, that both had mental health problems that interfered with their ability to safely parent him, that mother failed to recognize how

father's mental health problems presented a safety risk to L, and that father's inability to control his anger presented a safety threat to L.

The court held two review hearings, one in March 2013 and another in May 2013; each ended in a determination that continued substitute placement was necessary. In August 2013, the court held a permanency hearing and continued the permanency plan of reunification. At that time, the court ordered parents to participate in intensive parent-mentor training and one-on-one therapy and to continue in their current programs. At a November 2013 status check, DHS asked the court to order updated psychological evaluations of parents to assist in further case planning. The following January, DHS requested that the plan be changed to adoption. The court held a permanency hearing on January 10 and, on January 21, entered a permanency judgment that changed the plan to adoption. The court explained in its judgment that, one-and-a-half years after L's removal, parents could not safely parent L and, despite extensive services, there was no evidence that additional services for any period of time could result in parents making changes sufficient to equip them to safely parent L.

Parents appeal that permanency judgment. We begin our analysis with parents' due process challenge. Because we conclude that their due process rights were not violated in this case, we then proceed to examine whether the court correctly determined that the services provided to parents constituted active efforts, and whether the court correctly determined that parents had not made sufficient progress to allow L to return home. Finally, we address mother's contention that the change in plan was a "foster care placement" under ICWA that required expert testimony establishing that mother's custody was "likely to result in serious emotional or physical damage" to L.

## II. ANALYSIS

A. *Due process challenge to admission of out-of-court statements*

At the permanency hearing, parents objected to the admission of several exhibits on the ground that DHS

sought to admit those exhibits without providing parents with an opportunity to cross-examine the authors of out-of-court statements contained within the exhibits. The court admitted the exhibits over parents' objection, concluding that ORS 419B.325(2) and our decision in *Dept. of Human Services v. B. J. W.*, 235 Or App 307, 230 P3d 965, *rev den*, 349 Or 56 (2010), allowed admission of such evidence without regard to the competency of the evidence.[2] Further, the court determined that due process did not preclude the admission of the exhibits.

On appeal, parents limit their challenge to the trial court's admission of four exhibits. Parents take issue with the court's admission of (1) Sweet's December 2013 psychological evaluations of mother and father, (2) parenting mentor Krista Grensky's report, and (3) those portions of DHS's January 2014 court report that contained out-of-court statements by Sweet or Grensky. Father, joined by mother, contends that, at a permanency hearing in an ICWA case where DHS seeks to change the plan from reunification to adoption, the court may not admit out-of-court statements purporting to be expert opinion on critical issues before the court without allowing for cross-examination of the authors of those statements. Parents explain that the out-of-court

---

[2] ORS 419B.325(2) provides that, "[f]or the purpose of determining proper disposition of the ward, testimony, reports or other material relating to the ward's mental, physical and social history and prognosis may be received by the court without regard to their competency or relevancy under the rules of evidence."

ORS 419B.476(1) states that "[a] permanency hearing shall be conducted in the manner provided in ORS 418.312, 419B.310, 419B.812 to 419B.839 and 419B.908, except that the court may receive testimony and reports *as provided in ORS 419B.325*." (Emphasis added.) In *B. J. W.*, 235 Or App at 313, we concluded that ORS 419B.325(2) "allows the admission of material in reports that either the court or DHS ordered for the purpose of evaluating whether, or to what extent, father can maintain his relationship with [the child]." That is, we concluded that "evidence relates to a ward's 'mental, physical and social * * * prognosis' if it provides information that is relevant to a forecast or prediction of how the ward will fare in the future, and it necessarily includes information about the ward's future potential caregivers." *Id.* at 312; *see also Dept. of Human Services v. J. B. V.*, 262 Or App 745, 756-57, 327 P3d 564 (2014) (determining that the juvenile court may rely on ORS 419B.325(2) to receive exhibits for purposes of making its determination under ORS 419B.476(2)(a)).

Mother argues that ORS 419B.325(2) should not apply to cases governed by ICWA. We reject mother's argument. We based our decision in *B. J. W.* on a construction of ORS 419B.325(2) that applies equally in this case. Accordingly, *B. J. W.* controls.

statements in those reports were central to the issues that the court had to decide before changing the plan (*i.e.*, the adequacy of services and parents' progress). According to parents, the court's admission of those exhibits, without any opportunity to cross-examine the authors of the out-of-court statements contained within, violated their procedural due process rights.

Juvenile dependency proceedings implicate the due process rights of parents. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 188, 796 P2d 1193 (1990). "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined." *Lassiter v. Department of Social Services*, 452 US 18, 24, 101 S Ct 2153, 68 L Ed 2d 640 (1981). It "'is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Id.* (quoting *Cafeteria Workers v. McElroy*, 367 US 886, 895, 81 S Ct 1743, 6 L Ed 2d 1230 (1961)). Accordingly, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 US 471, 481, 92 S Ct 2593, 33 L Ed 2d 484 (1972).

In *Mathews v. Eldridge*, 424 US 319, 334-35, 96 S Ct 893, 47 L Ed 2d 18 (1976), the United States Supreme Court explained that, when a court is charged with deciding if due process was satisfied in a particular instance, the court must evaluate three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the * * * burdens that the additional or substitute procedural requirement would entail."

Parents maintain that those factors, applied in the circumstances of this case, dictate the conclusion that admission of the exhibits violated their due process rights. They emphasize DHS's aim to change the permanency plan to adoption; father's known cognitive impairments, illiteracy, and history of abuse as a child; and the overarching purpose of ICWA, which is to avoid the unwarranted break-up of Indian families. Applying the *Mathews* framework to

those circumstances, parents contend that the liberty interest at stake—their interest in the care, custody, and control of their child—is great. They also assert that the admission of "incompetent" evidence unacceptably increased the risk that the court might err in making the determinations required by ORS 419B.476(2)(a) because cross-examination is the critical means by which they could test the reliability of the exhibits. Parents also claim that the additional procedure of calling the authors as witnesses, either in person or on the phone, would have placed an insignificant additional burden on DHS. Finally, parents argue that the government's interest in not making the authors available for cross-examination is minimal.

DHS counters that father and mother seek to impose additional procedural requirements at a stage of the juvenile dependency proceedings that does not warrant them. DHS focuses on the role of a permanency hearing in the larger context of the juvenile dependency process. It contends that the permanency hearing is not a "key juncture" in which due process requires DHS to produce witnesses for cross-examination. Rather, a permanency hearing is intended to determine whether to change the case plan and, by that time, the child has already been removed from the parents' custody. DHS points out that the change in plan to adoption is a prerequisite for the filing of a petition for termination of parental rights and, at the termination hearing, DHS must prove "active efforts" throughout the course of the case, and ORS 419B.325(2) does not apply. DHS also asserts that parents could have done more to avail themselves of other procedures to limit any risk of erroneous deprivation by subpoenaing the witnesses. Given the function of a permanency hearing and the additional procedure that is required at any termination of parental rights hearing, DHS contends that the risk of erroneous deprivation of parents' liberty interest is ultimately low. Finally, DHS contends that there is a significant governmental interest in not having to produce the authors of reports at permanency hearings. DHS points to the potential expense of such a requirement, as well as the possibility that the additional process would necessitate scheduling delays that would be harmful to the child and, in some instances, statutorily impermissible.

For the reasons explained below, we agree that parents' due process rights were not violated in this case. Juvenile dependency proceedings implicate a number of competing interests. On one hand, they interfere with a parent's liberty interest in controlling the care and custody of his or her child. *State ex rel Dept. of Human Services v. W. P.*, 345 Or 657, 664, 202 P3d 165 (2009). There is no doubt that, as a general matter, "a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest[.]" *Lassiter*, 452 US at 27 (quoting *Stanley v. Illinois*, 405 US 645, 651, 92 S Ct 1208, 31 L Ed 2d 551 (1972)). Accordingly, the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects that liberty interest. *Id.* On the other hand, the dependency process implicates the government's "urgent interest" in the welfare of the child. *Id.* Moreover, the process is intended to protect the child's best interests, which includes a strong interest in finality in child custody disputes, and in having those disputes resolved as expeditiously as possible, consistent with due process. *Geist*, 310 Or at 186. Few things are as detrimental to a child as uncertainty about their living situation. *Id.* We also note that, because this is an ICWA case, the government has an interest in preventing the unwarranted break up of Indian families.

Those interests must be examined in consideration of the time, place, and circumstances within which the due process claims arise. Accordingly, as DHS urges, we consider parents' claim that the lack of additional procedure violated due process within the context of the juvenile dependency scheme.

We agree with DHS that, in this case, the permanency hearing was not a "key juncture" in which due process prohibited the juvenile court from admitting the exhibits without regard to competency under ORS 419B.325(2). Permanency hearings occur at regular intervals after the court has taken jurisdiction over the child and placed the child in substitute care. *See* ORS 419B.470. That is, the state has already taken physical and legal custody of the child. The permanency hearing statute "evinces the

specific policy objective that children not be left indefinitely in a placement limbo, and it also more generally reflects a child-centered policy orientation to the dependency process." *State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 468-69, 180 P3d 69, *rev den*, 344 Or 670 (2008). Therefore, the purpose of a permanency hearing is to reach a decision concerning the appropriate permanent plan for the child and to review the progress of the family and DHS in terms of the case plan requirements or to adjust the case plan in light of that progress. As such, a permanency hearing serves the interest of achieving permanency for the child as expeditiously as possible, while providing court oversight of DHS's efforts to do so and the parents' progress towards achieving reunification. Given the purpose of a permanency hearing, and the interests involved at that stage, we recognize why the legislature would provide for the admission of certain evidence under the relaxed strictures of ORS 419B.325 at such a hearing. Despite the relaxed evidentiary standards, however, we note that other procedures—namely the power to subpoena witnesses—are available in juvenile proceedings. *See* ORS 419B.893 - 419B.911. *Mathews* instructs us to consider the risk of an erroneous deprivation of parents' liberty interests through the procedures used. Accordingly, the ability to subpoena the authors of reports used at permanency hearings to question their credentials, recommendations, and the bases for those recommendations, suggests that the risk of erroneous deprivation of parents' liberty interests in this case was less than parents contend.

That conclusion is bolstered by the fact that a permanency hearing—even one in which the permanent plan is changed to adoption—is not a proceeding to finally determine if a parent's legal ties to their child should be severed. Parents acknowledge that the proceeding here is not one to terminate their parental rights, but contends that "it is the last procedural hurdle that the state needed to surmount before it could file such an action." In our view, that is an important distinction that cuts against the relief parents are seeking. That is so because the termination of parental rights process includes significant additional procedural protections of a parent's liberty interest. We need not describe all of the protections provided during a termination

of parental rights hearing, but we at least note that standard evidentiary rules apply, and, if an Indian child is involved, the termination of parental rights must be supported by evidence beyond a reasonable doubt. ORS 419B.521(4). Put simply, the additional procedural protections provided in a termination of parental rights hearing inform whether due process was violated in this case, because we must consider parents' claims in the context of the entire juvenile dependency scheme.

Considering the role a permanency hearing plays in the overall scheme, and the additional procedures that were available to parents at the permanency hearing and are provided at the termination stage, we conclude that there is a low risk that the procedures that parents complain about will lead to an erroneous deprivation of their liberty interest. Given that the risk is low, and factoring in the interests of the child and the government that are at stake in the proceeding, particularly achieving permanency in this case, we conclude that admission of the exhibits did not violate due process.

B. *Active efforts and sufficiency of parents' progress*

Next, we address the juvenile court's determination that DHS made active efforts to make it possible for L to return home and that parents have not made sufficient progress to make a return home possible. *See* ORS 419B.476(2)(a) (at a permanency hearing in an ICWA case where the plan is reunification, the court must determine whether DHS has made active efforts to make it possible for the child to safely return home and whether the parent has made sufficient progress to make it possible for the child to safely return home). We address DHS's efforts for each parent, and we also evaluate each parent's progress.

Because this is an ICWA case in which the permanency plan at the time of the hearing was reunification, the juvenile court had to determine whether DHS had made active efforts to make it possible for L to return home. "Active efforts" are more than "reasonable efforts." *Dept. of Human Services v. K. C. J.*, 228 Or App 70, 74, 207 P3d 423 (2009). We have defined active efforts to impose on DHS "an

obligation greater than simply creating a reunification plan and requiring the client to execute it independently." *State ex rel Juv. Dept. v. T. N.*, 226 Or App 121, 124, 203 P3d 262, *rev den*, 346 Or 257 (2009). "Active effort means that [DHS] must assist the client through the steps of a reunification." *Id.* "The type and sufficiency of effort that DHS is required to make depends on the particular circumstances of the case." *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 799, 284 P3d 1233, *modified on recons*, 253 Or App 600, 292 P3d 565 (2012). "Whether DHS has provided appropriate services and made active efforts is evaluated in view of the nature of the parent's problems." *Id.* at 802.

At the time that the court took jurisdiction of L, DHS identified the nature of parents' problems as: (1) cognitive delays whose effect on understanding and reconciling safety threats is unknown; (2) anger and mental health issues; (3) verbalized confusion and serious disagreement with DHS involvement and the reasons they were unsafe parents; and (4) "aggressive and dismissive attitude *** towards safety service providers [that] has made them unwilling or unable to accept help to ameliorate safety concerns." Therefore, in January 2013, DHS separately presented father and mother with action agreements. Father's agreement informed him that DHS expected him to reengage in the "S.A.F.E. Program" (an anger management program) through Valley View Counseling, to actively participate in parenting classes, to regularly attend visits with L, and to keep his DHS case-worker apprised of his progress through weekly contacts. Similarly, mother's agreement explained that she needed to actively participate in mental health treatment and parenting classes, attend visitation sessions during which she would accept and utilize feedback from the visit supervisor, and keep in contact with her caseworker.[3]

Throughout the life of the case, DHS provided supervised visits for parents at a DHS office. Parents attended the visits faithfully. In general, father engaged and bonded with L. Mother struggled to comfort L and generally deferred to father during joint visits. At times, mother

---

[3] DHS also provided mother with updated action agreements in April and November 2013, and father with an updated agreement in August 2013.

had difficulty engaging with L, particularly for any stretch of time. Both parents often "misread" L's cues; for example, they would attempt to get L to take a nap when he was not tired. DHS staff and clients often complained about father's poor hygiene. At a visit in December 2013, father "screamed profanities and stomp[ed] around" when confronted with hygiene concerns.

In October 2012, and again in December 2012, DHS referred parents to In-Home Safety and Reunification Services through Options Counseling. Parents completed a parenting class through Options between March and May of 2013. During that program, parents watched and discussed many parenting videos. Father did not agree with all of the concepts presented, but he was willing to discuss other points of view. Mother was generally inattentive during the videos, often sending text messages on her phone or working on a "craft project."

DHS also referred father to an anger management program—the S.A.F.E. Program.[4] In early 2013, father attended orientation; the initial report indicated that he "seems open." Father initially participated productively in group sessions as well. However, by May, his group therapist noted that he was having trouble understanding why some of his outbursts at the DHS office were inappropriate. His group counselor noted that father had learned anger management tools, and he needed to participate in individual therapy so that he could remove the psychological obstacles to putting those tools into practice. Father began attending individual therapy sessions in June 2013; his counselor noted that he "seems willing to discuss issues that can be very challenging for him. Much of his anger is related to childhood abuse." The counselor believed that father would make progress in his anger management when he could "resolve the longstanding repressed emotions related to childhood." Father missed some sessions in July and August, but returned to individual therapy in August 2013. In October, his counselor noted that father had participated

---

[4] Father had previously been referred to S.A.F.E. in 2010 because of the dependency case relating to his other child, but he had stopped attending the program after four months and had been terminated from the program.

well in therapy, but that he continued to falter in his ability to implement the tools that he had learned to use in resolving conflict. Nevertheless, his counselor opined that father had made significant progress in changing his behavior. In mid-November, however, father angrily left his individual session early because he was upset by a question from his counselor regarding marijuana use. Father never returned to therapy and his counselor discharged him from the program later that month for noncompliance, *i.e.*, "failing to attend scheduled appointments."

Beginning in May 2013, DHS provided one-on-one parenting coaching through Grensky. The original plan was for Grensky to meet with parents during their visits with L at the DHS office twice a month to observe their interactions with L, and to meet with parents once a week at their home for two-hour intensive coaching sessions. During the last two weeks of May, Grensky's attempts to schedule an in-home assessment failed. On May 30, she met parents at DHS for their visit with L. Father informed Grensky that if he did not like her, the sessions would not occur. Grensky's initial impression was that parents viewed themselves as victims; they did not understand why DHS was involved in their lives, and they did not believe that they needed any help with their parenting. Those impressions bore out in practice over the next few months.

In June and July, Grensky provided weekly supervised coaching sessions at the DHS offices, but parents prevented her from scheduling any sessions at their home, even though the DHS caseworker had emphasized to Grensky that in-home coaching was important. The sessions at DHS went poorly. They followed a pattern: father would dominate the visit with L, mother would struggle to engage with L, and parents would generally ignore, or actively thwart, Grensky's attempts to coach them. Parents failed to identify areas in which they could improve their parenting skills and often put their needs above L's needs. Father was also at times hostile, angry, and explosive. At a June session, father used abusive language and behavior towards Grensky in L's presence; neither parent recognized how such behavior could be frightening for L. Grensky also terminated a session in July because of father's explosive behavior and

inappropriate language. Father, in an angry, hostile, and profane manner, expressed that he was sick of doing things for DHS and left the room on three different occasions, each time returning and continuing to "swear and yell." After that session, Grensky approached the DHS caseworker about terminating the sessions. The caseworker asked Grensky to continue.

On August 1, Grensky attempted to complete a coaching session with parents at a park for L's first birthday party. However, parents refused to engage with Grensky, and she terminated the session when family members showed up for the party. On August 8, parents changed a scheduled three-hour coaching session at DHS to one-and-a-half hours. At that session, father disciplined one-year-old L with a "time-out." He rejected Grensky's suggestion that such discipline was inappropriate for a child of that age. Grensky again observed that parents failed to follow L's "cues" and that they only focused on their needs. Grensky concluded that parents showed no signs of retaining the materials that she had provided and no progress on building nurturing skills. She explained, "It does not seem to matter which learning style I implement nor the manner and attitude in which I present concepts. These parents do not retain or apply the provided skills."

After a mid-August coaching session at DHS, Grensky informed DHS that she viewed parents' progress to be "dismal" given that their cognitive delays and mental health issues "keep them parenting in the now." She noted that parents had implemented none of the skills and tools that she had provided to them, that the coaching was not working, and that parents were not invested. Finally, she noted that parents had once again cancelled her scheduled home visit. At the following session, parents spent the entire session venting about DHS, and father became agitated when Grensky attempted to discuss safety threats to L. The following week, father became angry and argumentative, yelling at Grensky, telling her that she was "stupid" and did not know what she was talking about, and finally stormed out of the room. After that visit, Grensky terminated her contract "for the first time in 16 years."

Meanwhile, mother began participating in group mental health treatment through Douglas County Health and Social Services in February 2013. Initially, she indicated that she did not believe that she needed mental health treatment. However, in April 2013, she began group and individual therapy sessions to address her adjustment disorder and depression. She participated regularly in the treatment, and attained or made significant progress toward her goals.

Sweet, at the request of DHS, completed an updated psychological evaluation of father in December 2013. In that evaluation, Sweet explained that, when he had evaluated father the prior year, he had diagnosed him with "intermittent explosive disorder, learning disorder with deficits in reading and writing, borderline intellectual functioning and a personality disorder with paranoid and passive-aggressive features." Sweet explained that, at the time, he had believed it was critical that father complete an anger management program because he could not control his anger; indeed, father did not understand what anger was and why people were concerned about it. Sweet noted that throughout the December 2013 evaluation, father was agitated, angry, and argumentative. Sweet concluded that "the results of the evaluation are very consistent with the evaluation I conducted last year and that would indicate [father] has not made significant progress since I last saw him." Sweet further concluded that father's numerous deficits and problems interfere with his ability to make progress and put himself in a position to function as a parent. Further, father continued to have great difficulty controlling his impulses and failed to apply the tools he had learned to combat his anger management problem. Finally, Sweet recommended that DHS pursue a "more permanent alternative" for L because he did not believe that father would be in a position to adequately and safely parent L in the foreseeable future. And Sweet noted, "I am not aware of any other sevices that you might attempt with him. The services that you provided or referred him to offered the best opportunity for him to effect positive change."

Sweet also completed an updated psychological evaluation of mother in December 2013. Sweet explained that, in 2012, he had diagnosed mother with adjustment disorder

with mixed anxiety and depressed mood, low cognitive abilities, and a personality disorder with passive-aggressive and dependent features. At that time, he had also noted that mother focused more on her relationship with father instead of making attempts to meet L's needs. During the December 2013 evaluation, mother minimized and denied the problems that led to DHS involvement, and Sweet left the evaluation unclear if mother had acquired any understanding of father's anger problems. Sweet concluded that mother had not made progress since her last evaluation, and that it did not appear that mother's problems are going to be ameliorated in the foreseeable future "if they could ever be ameliorated." He noted that her personality disorder made it very difficult for her to function effectively in the community, and she "is very dependent on [father] and minimizes and denies problems that he has. She seems to be more interested in maintaining that relationship than trying to put effort into making changes in her life." In conclusion, Sweet opined that mother had been offered a "comprehensive intensive set of services and it has not been effective due to her limitations and defensiveness."

Given the extensive and appropriate services offered to father and mother, and DHS's persistent involvement in attempting to shepherd parents through those services, the trial court did not err in determining that DHS provided active efforts to parents. We reject father's contention that DHS failed to appropriately take into account and tailor the provided services to his cognitive impairment. In particular, he claims that DHS failed to properly monitor Grensky to ensure that her services were properly tailored to address father's disabilities and that DHS failed to provide a replacement service provider when Grensky terminated services with the family. We disagree. From the beginning, DHS identified the deficits that prevented parents from safely parenting L and implemented individualized and extensive services tailored to their needs. Grensky used a variety of teaching techniques that were intended to convey information that parents could absorb despite their cognitive delays.

We also conclude that the trial court did not err in determining that neither father nor mother had made sufficient progress to allow L to safely return home. According

to father's anger management counselor, father was making progress in therapy. However, father's actions outside of his therapy sessions belied any significant progress in dealing with his anger. Episodes of abusive behavior and language persisted throughout the coaching sessions with Grensky, and he stormed out of his anger management therapy session and never returned because of a question he did not appreciate. In fact, father continued to have explosive anger episodes as late as two weeks before the permanency hearing. Much of that behavior occurred in L's presence. Given his behavior and Sweet's evaluation, the record supported the juvenile court's conclusion that father had not effected appropriate changes that would allow him to be a parenting resource for L.

The record reflects that mother also failed to demonstrate that she had made sufficient progress to allow L to return home. Mother continually failed to comprehend why DHS was involved in her life. She was dependent on father and minimized and denied that he had an anger management problem. Further, she failed on many occasions to demonstrate that she could safely care for L. She was often disengaged and distracted during visits and persistently had difficulty responding to L's basic cues; consequently, she failed to provide for his needs. Finally, Sweet's evaluation was consistent with mother's actions over the course of the dependency case. Whatever progress she made in her individual therapy does not appear to have resulted in changes in her ability to be a resource for L.

C. *Whether change in permanency plan to adoption is a "foster care placement"*

Finally, we address mother's argument that a change in plan from reunification to adoption is a "foster care placement" under ICWA that required expert testimony that mother's custody was "likely to result in serious emotional or physical damage" to L. Under ICWA, a "foster care placement" is defined as

"any action removing an Indian child from its parents or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent * * * cannot have the child returned

upon demand, but where parental rights have not been terminated[.]"

25 USC § 1903(1)(i). Pursuant to ICWA,

"[n]o foster care placement may be ordered * * * in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

25 USC § 1912(e).

Mother argues that the change in the permanency plan from reunification to adoption was a "foster care placement" and that the court erred by ordering such a placement without expert testimony that continued custody by mother was likely to result in "serious emotional or physical damage" to L.

Two cases bear on this issue. In *Dept. of Human Services v. W. H. F.*, 254 Or App 298, 303, 295 P3d 78 (2012), *rev den*, 353 Or 428 (2013), we addressed the issue of whether ICWA required a showing of "active efforts" when the juvenile court has continued the permanency plan of adoption after a permanency hearing. To do so required us to decide whether the permanency hearing was a proceeding to "effect a foster care placement." We concluded:

"Here, no party sought to remove S from his parents. S had been removed from his parents in an earlier proceeding, where, presumably, active efforts occurred; during this proceeding, S was already in foster care. A continuation of a permanency plan for adoption is not the act of effecting a 'foster care placement' as defined, and we conclude that a showing of active efforts is not required by ICWA in that context."

*Id.* at 304.

Subsequently, in *Dept. of Human Services v. J. G.*, 260 Or App 500, 515, 317 P3d 936 (2014), we were faced with the question of whether a durable guardianship was a foster care placement, or whether a party is "seeking to effect a foster care placement" at a hearing to establish a guardianship under ORS 419B.366. In *J. G.*, we concluded that ICWA's

definition of "foster care placement" should not be read narrowly to include only the initial removal of the child from his or her parents, but that ICWA is also intended to apply to subsequent placements. *Id*. at 519. We further concluded that the establishment of a guardianship was a "foster care placement." After acknowledging that the child's guardian was his current foster parent, we determined that, because a guardianship was a "significant shift in legal rights that legally removed him from the foster care placement he was in for further placement as a ward in a guardianship[,]" the child had been removed for purposes of the definition of "foster care placement." *Id*. at 520.

The situation in this case is more like *W. H. F.* than *J. G.* As in *W. H. F.*, L had already been removed from his parents in an earlier proceeding, and, during the permanency hearing at issue in this case, L was already in foster care. Unlike *J. G.*, this case did not involve the "significant shift in legal rights" that occurs when a guardianship is established. 260 Or App at 520. That aspect of *J. G.* was essential to its holding, and without something similar in this case, we conclude that the change in permanency plan from reunification to adoption was not a "foster care placement" within the meaning of ICWA.

Affirmed.