Argued and submitted October 25, 2016, affirmed January 11, petitions for review denied April 27, 2017 (361 Or 439)

In the Matter of L. M. G. M,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. L. M.,
fka M. L. H.,
and J. L. M., aka J. L. M., II,
*Appellants.*

Douglas County Circuit Court
1200227;
Petition Numbers 14JU104TPR,
14JU105TPR; A162043

388 P3d 1226

Angela Sherbo argued the cause and filed the briefs for appellant J. L. M.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant M. L. M.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Sercombe, Presiding Judge, and Flynn, Judge, and DeHoog, Judge.

**FLYNN, J.**

Mother and father appeal from a judgment terminating their parental rights to their child, L, in a case that is governed by the Indian Child Welfare Act (ICWA), 25 USC §§ 1901-1963. On *de novo* review, ORS 19.415(3)(a), we affirm the judgment of termination.

## I. BACKGROUND

The juvenile court entered a judgment of jurisdiction shortly after the birth of L, parents' second child, based on parents' admissions that (1) they lacked the parenting knowledge to ensure L's safety, (2) both had mental health problems that interfered with their ability to safely parent L, (3) father's inability to control his anger presented a safety threat to L, and (4) mother failed to recognize how father's mental health problems presented a safety risk to L. *Dept. of Human Services v. J. M.*, 266 Or App 453, 456-57, 338 P3d 191 (2014), *rev den*, 356 Or 689 (2015). Many of the facts regarding the conditions that gave rise to jurisdiction and regarding DHS's efforts to address those conditions are set out in *J. M.*, in which we affirmed the trial court's change of the permanency plan for L from reunification with parents to adoption.[1]

Father is a member of the Choctaw Nation, and the parties agree that L qualifies as an "Indian child" under ICWA. 25 USC § 1903(4). Thus, DHS is required to meet both the state law standard for termination as well as additional procedural and substantive safeguards that ICWA imposes, and which Oregon has adopted for terminations involving an "Indian child." ORS 419B.521(4). Under Oregon law, to terminate parental rights, the court must find "that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child," ORS 419B.504, that "integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change," and that termination of parental rights is in the best interests of the child. ORS 419B.500. Additional safeguards imposed by

---

[1] The permanency hearing discussed in *J. M.* was held 24 months before the termination trial, which was held in August, 2015.

ICWA include a requirement that DHS prove that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," 25 USC § 1912(d), as well as a requirement that the court determine that parents' continued custody of their child "is likely to result in serious emotional or physical damage to the child." 25 USC § 1912(f); ORS 419B.521(4). Moreover, those determinations must be "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses" who "possess special knowledge of social and cultural aspects of Indian life." *Dept. of Human Services v. K. C. J.*, 228 Or App 70, 73, 207 P3d 423 (2009) (internal quotation marks omitted).

## II. DISCUSSION

On appeal, parents challenge DHS's proof as to nearly every requirement for termination, including the requirement of "active efforts." They also challenge DHS's reliance on evidence that parents are unable to maintain a clean and safe living situation, arguing that those concerns are beyond the scope of the bases for jurisdiction. As indicated above, we reject each of parents' challenges and affirm the judgment of termination. We write primarily to address parents' argument that DHS failed to demonstrate beyond a reasonable doubt that it engaged in "active efforts" to provide services to prevent the break-up of the family, as required by ICWA.

### A. *Active Efforts*

The ICWA "active efforts" requirement applies to "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law." 25 USC § 1912(d). At those stages of a case, DHS must satisfy the court "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *Id.* "Active effort means that DHS must assist the client through the steps of a reunification." *J. M.*, 266 Or App at 464 (internal quotation marks and brackets omitted). That standard

"impose[s] on DHS 'an obligation greater than simply creating a reunification plan and requiring the client to execute it independently.'" *Id.* at 463-64 (quoting *State ex rel Juv. Dept. v. T. N.*, 226 Or App 121, 124, 203 P3d 262, *rev den*, 346 Or 257 (2009)).

Father argues that DHS failed to make active efforts, because "services aimed at ameliorating the conditions or conduct that are alleged by the state to be seriously detrimental" ended one to two years before the date of the termination trial. According to father, "[b]ecause the termination of parental rights may only be ordered upon a finding of present unfitness, the efforts to ameliorate the conduct or condition that allegedly renders a parent unfit must also be current." We disagree with father's legal premise as well as with his view of the factual record.

We have not previously considered whether "active efforts" must consist of services that are "current" through the date of termination. However, we observe that the language of 25 USC § 1912(d) does not refer to any fixed time period during which services must be provided in order to constitute active efforts. Rather, the statute simply requires a showing at various points "that active efforts have been made."

Moreover, in construing the active efforts requirement at earlier stages of an ICWA proceeding, we have explained that "[t]he type and sufficiency of effort that DHS is required to make" to satisfy the "active efforts" requirement "depends on the particular circumstances of the case." *J. M.*, 266 Or App at 464 (internal quotation marks omitted); *see also Dept. of Human Services v. D. L. H.*, 251 Or App 787, 799, 284 P3d 1233, *on recons*, 253 Or App 600, 292 P3d 565 (2012), *rev den*, 353 Or 445 (2013) (considering circumstance of parent's ongoing incarceration in determining whether DHS had made "active efforts"). Among those particular circumstances of the case is "the nature of the parent's problems," which can include whether the parent has rejected offered services or believes that services are unnecessary. *See State ex rel Juvenile Dept. v. Woodruff*, 108 Or App 352, 357, 816 P2d 623 (1991) (concluding that agency satisfied its ICWA obligation to provide services "in view

of the nature of father's problems," including that father declined to participate in offered services because he denied a need for those services). Thus, although an early cessation of services could indicate that DHS is not making "active efforts * * * to prevent the breakup of the Indian family," as required by 25 USC § 1912(d), we conclude that timing is not the only relevant consideration.[2]

Here, the record establishes beyond a reasonable doubt that "in view of the nature of" these parents' problems, DHS made "active efforts * * * to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." A detailed discussion of the "extensive and appropriate" services that DHS provided to address parents' mental health issues and parenting limitations prior to the January 2014 permanency hearing is set out in our prior opinion. *See J. M.*, 266 Or App at 469. We do not repeat that discussion here, except to emphasize that DHS first began providing services to parents several years before L was born and, from shortly after L's birth, provided an extensive array of services to address parents' mental health and parenting issues.

In addition, we highlight the significant efforts of parents' DHS caseworker throughout the case. Father described the parents' DHS caseworker, Cindi Corrie, as "the main one that I think everybody should have." Corrie took an unusually active role in this case. For example, Corrie personally helped during the supervised visits between parents and L, although that was not the usual caseworker role. Corrie facilitated culturally appropriate services for father by reaching out to the Choctaw Nation, and the local Cow Creek Tribe, which offers some reciprocal services for Choctaw members. Corrie arranged for parents to receive financial assistance to aid them in reunification, which included providing bus passes and gas cards to assist

---

[2] Courts from other jurisdictions that have considered this question have also construed the ICWA "active efforts" requirement as circumstance dependent, without a fixed temporal requirement. *See, e.g., In re JL*, 483 Mich 300, 324, 770 NW2d 853 (2009) (rejecting argument in a termination of parental rights proceeding that 25 USC § 1912(d) "requires current active efforts," holding that "the timing of the services must be judged by reference to the grounds for seeking termination and their relevance to the parent's current situation").

parents with the costs of transportation to visits with L. When father needed help with paying the co-pay required for his counseling sessions, Corrie arranged for the Choctaw Nation to cover the amount so that father could continue his sessions. DHS's financial assistance continued through the termination trial, in the form of the extra funds that parents requested to help them afford transportation to town for the trial.

DHS continued to provide services after the permanency hearing. We discuss in detail only the services in those areas that parents specifically criticize.

1. *Mental health services for father*

Although parents criticize DHS's efforts to assist father with mental health services in the last year of the case, DHS made active efforts with regard to those services. Father's mental health diagnoses include borderline intellectual functioning, intermittent explosive disorder,[3] a learning disorder, and a personality disorder with paranoid, avoidant, and passive-aggressive features. *J. M.*, 266 Or App at 456. At the time of the permanency hearing, father had most recently been receiving counseling from Joseph LaMartina, which had ended after father become angry and walked out of a counseling session and then failed to attend subsequent scheduled appointments. *Id.* at 466. The failed effort by LaMartina followed an earlier effort with a different counselor that failed because father did not think that he needed mental health services and repeatedly cancelled appointments.

Nevertheless, DHS re-referred father to counseling with LaMartina after the permanency hearing. Those new sessions ended in May 2014 because father was uncooperative. After LaMartina reported that father "had 'no idea' why he was re-referred for treatment" and "didn't seem very interested in finding out why he was being referred," Corrie scheduled a meeting with father and LaMartina to discuss

---

[3] Expert testimony at the termination trial explained that a person with intermittent explosive disorder has a lot of difficulty controlling his or her anger. This can lead to both verbal and physical aggression that occurs intermittently and sometimes without provocation. As manifested in father, however, there is only evidence that the disorder causes verbal explosions of anger.

the goals for the renewed counseling effort. During that meeting, father became angry about suggestions regarding his personal hygiene and left the office. He did not return for more sessions with LaMartina.

That was not the end of father's mental health services, however. Corrie investigated services for which father would be eligible through the local Cow Creek Tribe. She learned that father was eligible for free medical and mental health services through the Cow Creek Clinic and advised him of that fact. Contemporaneously, father discovered those services on his own and, in June 2014, began counseling with Julie Hargraves, a Licensed Clinical Social Worker at the Cow Creek Clinic. Corrie provided Hargraves with information about father's case and communicated with Hargraves regarding father's counseling.

As with LaMartina, father's sessions with Hargraves stopped abruptly after father became angry and left the office during the middle of a session. Hargraves tried to convince father to stay and discuss the issue but father was "noticeably angry" and "there was no stopping him." Father eventually returned to counseling with Hargraves but, last attended a session with her two months prior to the termination trial.

2. *Parenting services*

DHS made active efforts to provide parenting services "in view of the nature of" parents' problems. The parenting services that DHS provided through the time of the permanency hearing are described in our prior opinion. They include efforts of parenting coach Krista Grensky, who viewed parents' progress as "dismal" due to their cognitive delays and mental health issues, and who "terminated her contract 'for the first time in 16 years'" after a visit in which father became angry and argumentative and stormed out of the room. *See J. M.*, 266 Or App at 466-67.

After the permanency hearing, Corrie arranged for a different parent trainer to work with parents from February through April 2015. Neither parent was making progress, and Corrie testified that, "because of [parents'] mental health issues and their cognitive disabilities they have been unable

to get or understand the parenting practices and other services that have been presented to help them."

In addition to those parenting sessions offered after the permanency hearing, parents also received parent coaching from Ron Wilmot, who facilitated community visits between parents and L in the fall of 2014. Wilmot's supervision role included coaching, but he felt forced to minimize his parenting advice to the most immediate threats because father reacted poorly to any comments that he perceived as criticism. Wilmot had worked with parents in varying capacities beginning in 2010, and, beginning in 2012, he had supervised visits between parents and L both at a DHS office and in the community. Wilmot supervised over 100 visits between L and parents. Wilmot's supervision of community visits ended in November 2014 because the weather began to prohibit outdoor activities and because there was no safe, appropriate home environment available. Wilmot did not think that either parent had made significant improvement in parenting skills by the time that he stopped working with them. He believed that father does not understand "what is acceptable behavior" or "what is safe for a child" and that father "really struggled" with receiving advice because "in [father's] mind *** he really doesn't see a problem." As a result, Wilmot concluded that father was "not teachable."

After the community visits ended, DHS continued weekly visits between parents and L at the DHS office, through the month of the termination hearing. Many of those included Corrie providing parents with significant guidance and advice about parenting L.

3. *Other services*

Given the nature of parents' challenges, the services described above constitute "active efforts." However, we briefly address a number of other services that, parents argue, DHS could have provided—such as housing assistance, house-cleaning assistance and possibly job placement assistance.[4] We have already explained that "[t]he type and

---

[4] Father testified that, in order for L to live with parents, father thinks he would need help finding work—which he finds difficult given the lack of a GED or diploma—and that he needs to be able to afford a decent place to live.

sufficiency" of services that will satisfy the "active efforts" requirement "depends on the particular circumstances of the case," including "the nature of the parent's problems." *J. M.*, 266 Or App at 464 (internal quotation marks omitted). In this case, the "type and sufficiency" of services was influenced by the fact that DHS's first priority was parents' inability to safely parent L. As the caseworker convincingly explained, until parents made progress to address the parenting limitations that are the basis for jurisdiction, DHS was "not anywhere close" to being worried about the home setting to which L would be returning. Although parents received general advice on the condition of their home during the parenting sessions and from Corrie, she explained that DHS did not address the issue more specifically, because—on services across the board—"there has been a lack of progress and follow through." Corrie believed that "adding one more service that was looking at a specific area would not be able to be sustained and followed through on." Thus, in view of the nature of parents' problems, we are persuaded that DHS made active efforts to provide services to prevent the break-up of this Indian family.

B. *DHS's active efforts were not successful.*

We are also persuaded that the active efforts "have proved unsuccessful" and that that parents' continued custody of L "is likely to result in serious emotional or physical damage" to L. 25 USC § 1912(d), (f); ORS 419B.521(4). As a result, we find that parents remain unfit "by reason of conduct or condition seriously detrimental to the child," ORS 419B.504, that parents' custody of L "is likely to result in serious emotional or physical damage," 25 USC § 1912(d), to L, and that integration of L into parents' home "is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504.

1. *Conditions within scope of jurisdictional bases*

Before addressing the evidence that parents continue to suffer from the conditions that are seriously detrimental to L, we briefly address parents' argument that the court cannot consider evidence of parents' failure to maintain a clean and suitable living environment because that consideration was not one of the alleged bases for jurisdiction.

As the trial court explained, Wilmot described the conditions that caused him to conclude that parents' home was too unsafe and unsanitary to be the site of visits with L as including an overwhelming odor of urine as well as a pot of rotten food and a lack of heat. According to Corrie, the yard of the house was full of unsafe debris, and parents continued to keep a dog that mother testified had already bitten her and maternal grandmother.

We conclude that the evidence of parents' failure to maintain a clean and suitable living environment is properly considered as an aspect of the admitted jurisdictional bases and part of the totality of the circumstances that we consider in determining whether parents' conduct or condition is seriously detrimental to L. *See Dept. of Human Services v. E. N.*, 273 Or App 134, 151, 359 P3d 381, *rev den*, 358 Or 374 (2015). The evidence demonstrates that parents' inability to maintain a clean and child-safe living environment is an issue related to the mental health problems that broadly interfered with their ability to safely parent L, rather than a separate issue—such as a lack of skill or ability to clean. For example, the evidence that mother's job primarily involved cleaning a restaurant facility demonstrates that she possessed cleaning knowledge and skill. However, mother testified that she believes their home is clean enough, although she acknowledged having been told by DHS that their home is not clean enough for L. Thus, parents' inability to keep the house clean and safe is a part of the totality of the circumstances to be considered as part of their mental health and parenting limitations, which are bases alleged in the petition for termination and bases for the juvenile court's jurisdiction.

2. *Evidence of father's current mental health condition*

In general, further written discussion of parents' challenges, beyond that already set out in this opinion and in our prior opinion, would not benefit the bench, bar, parties, or public. However, we discuss father's current mental health condition in more detail because there is evidence that, shortly before the termination trial, father made some progress in controlling his emotional outbursts in the context of his counseling sessions with Hargraves. Nevertheless,

the triggers to father's explosive outbursts remain unpredictable, and father is usually not able to recognize—in advance—that an angry outburst is coming on. Moreover, father's progress is further complicated by his limited cognitive abilities that reduce his understanding and awareness of his mental health or the reasons he may explode.

Indeed, at trial, father demonstrated his lack of understanding of, and inability to manage, his anger problem. Father testified that he simply has a problem with his voice getting loud unexpectedly and that the loud voice does not mean that he is yelling or angry. However, through father's presentation at trial, the juvenile court "observed that he appeared to be angry and aggressive a number of times during the testimony of other witnesses testimony and with his own counsel." We agree that father's demonstrated lack of control while in court is significant, because father was likely using the best behavior of which he was capable during trial. *See State ex rel Juv. Dept. v. J. L. M.,* 220 Or App 93, 95, 120, 184 P3d 1203, *rev den,* 345 Or 158 (2008) (concluding, on *de novo* review, that the "[f]ather's problems in managing anger are evident * * * in his conduct during trial, a time when he reasonably would be expected to be on his best behavior").

While father has made some progress, we remain convinced that parents' conditions are seriously detrimental to L and are not likely to change enough to allow them to safely integrate L into their home within a reasonable time. Corrie described father's progress after six years of DHS efforts as "tiny little baby steps." Dr. Sweet, who has evaluated father three times over the life of the case, testified that father's progress at the time of the termination trial amounted to the level of progress that he had hoped father would have been able to make in his initial treatment sessions back in 2012. In Sweet's opinion, it would take years of continued progress before father would be able to successfully parent. Hargraves did not disagree with that assessment. She acknowledged that it could take years for father to learn how to deal with unanticipated triggers and that even father's coping mechanism—walking away until he calms down—presented a risk if he needed to attend to a small child.

### 3. *Seriously detrimental conditions*

Like the juvenile court, we find that the record establishes beyond a reasonable doubt that parents continue to suffer from the mental health conditions described in our permanency decision; that those conditions have prevented parents from learning the parenting skills and developing the awareness of L's needs that would be necessary for them to safely parent; and that those conditions, in combination with father's explosive disorder—and mother's inability to recognize and protect L from the threat posed by father's angry outbursts—are seriously detrimental to L and are not likely to change.[5] The evidence also establishes beyond a reasonable doubt that L's integration into parents' home is improbable within a reasonable time. And we are persuaded, as ICWA requires, that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 USC § 1912(f). As the juvenile court and DHS have observed, father cares deeply about L. But, like the juvenile court, we find that neither father nor mother is presently fit to safely parent L, and it is improbable that they will be able to safely parent L in a reasonable time.

### C. *Expert Testimony of Serious Damage to L*

As ICWA requires, our determination that parents' custody of L "is likely to result in serious emotional or physical damage" to L is "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses." 25 USC § 1912(f). The ICWA expert witness must possess "special knowledge of social and cultural aspects of Indian life" and "substantial expertise in his or her area of

---

[5] Father emphasizes that there is no evidence that his angry outbursts have been directed toward L, but the evidence establishes beyond a reasonable doubt that living with father's unpredictable explosions of anger is likely to cause serious emotional harm to L. *See* 25 USC § 1912(f); ORS 419B.521(4) (likelihood of "serious emotional or physical harm" is basis for termination); *cf. Dept. of Human Services v. B. J. J.,* 282 Or App 488, 503-04, 387 P3d 450 (2016) (reversing termination because DHS failed to prove that father's difficulty managing anger and struggles with an antisocial personality disorder, had manifested in ways that were seriously detrimental to his children). Moreover, it is also parents' lack of progress in acquiring the skills needed to safely parent L, in combination with the likely harm caused by living with father's explosive disorder, that demonstrate that DHS has proven its case for termination.

specialty." *K. C. J.*, 228 Or App at 73. Moreover, the witness's testimony should express whether "serious emotional or physical damage to the child is likely to occur if the child remains in the custody of the parent[s]." *Id.*

The expert requirement is satisfied in this case by the testimony of Kayla Davidson, an Indian Child Welfare Social Worker who has been working for the Choctaw Nation for 10 years. Neither parent disputes that Davidson is a qualified expert within the meaning of ICWA. Davidson testified to the opinion that, "returning [L] to his parents' care and custody would likely result in serious physical or emotional harm" and that active efforts had been provided by DHS to reunify the family. In support of her conclusion, Davidson pointed to parents' inability to understand L's basic needs and apply the knowledge they have received in parenting training, as well as to father's anger issues. Davidson did not think that any additional services could successfully ameliorate the conditions that brought L into care and that continued at the time of the termination trial.

Davidson's opinion is shared by the other experts, including Sweet, parenting trainer Grensky, and Lee Anne Wichmann, a therapist who testified as a child-specific expert after observing L six times in various settings. In combination, the various opinions and explanations establish beyond a reasonable doubt that a return to parents' custody "is likely to result in serious emotional or physical damage" to L.

D.  *Best Interest*

Finally, we conclude that the termination of parental rights is in the best interests of L, who has been living since birth with his biological brother in an Indian family foster placement that is also the planned adoptive resource for L. ORS 419B.500.

Thus we affirm the termination of mother's and father's parental rights to L.

Affirmed.